SOUTHERN RAILWAY CO. v. E. B. HARRIS, Admr. of VERNIE HARRIS

and

SOUTHERN RAILWAY CO. v. ROBERT B. HARRIS, by next friend, W. S. HARRIS.

Western Section.  February 9, 1929.

Petition for Certiorari denied by Supreme Court, May 27, 1929.

Charles H. Smith, of Knoxville, for plaintiff in error.
John W. Green, of Knoxville, for defendant in error.

HEISKELL, J.  These are suits to recover damages from the Southern Railway on behalf of two guests of the driver of an automobile, which was wrecked in a crossing accident.

On Sunday, November 7, 1926, Jewell Harris, about twenty-eight years old, undertook to convey her mother, Vernie Harris, fifty-seven years old, and her nephew, Robert B. Harris, four years old, to Sunday School near Corryton, Knox county, Tennessee, in an automobile owned jointly by the said Jewell Harris and her sister, Pearl Harris.

Jewell Harris, sitting on the left side of the front seat, drove the automobile, and her mother, Vernie Harris, sat on the rear seat immediately behind her, and her nephew, Robert B. Harris sat on the rear seat to the right of his grandmother, Vernie Harris. The three were the only occupants of the car. The road upon which the automobile traveled, known as the Emory Road, crossed the Southern Railway track at grade at a place near Corryton, Tennessee, known as Mynatt's Crossing. When all of the automobile, except the rear part, had passed over the crossing, it was struck by a passenger train of the Southern Railway running from Knoxville to Morristown. The automobile was wrecked and Vernie Harris was so seriously injured that she died in two days, and the little boy sustained minor injuries. The Administrator of Mrs. Harris brings suit to recover for her death, and the next friend of Robert B. Harris brings suit to recover for his injuries.

The two cases were tried together and resulted in a verdict in favor of the Administrator for $3500, and in favor of the next friend for $500. The court suggested a remittitur of $250 of the $500 judgment, which was accepted under protest. Jewell Harris also brought suit and a verdict was rendered in her favor but the court granted a new trial and set the verdict aside. The defendant railway company has appealed and assigned errors as to the judgment for death of Mrs. Vernie Harris and that for injuries to the boy Robert B. Harris.

The accident occurred on November 7, 1926, at Mynatt's crossing. The train was running practically north and the car running northeastwardly, the road crossing the railroad at an acute angle. There is a dip in the road to the southward of the railroad, but from 120 to 150 feet the view of the road from the train and of the train from the road is unobstructed. Any one, however, looking from the car to see the train approaching from the south would have to turn the head almost backward, whereas, the car was almost in front of the train.

There were three counts in the declaration, but the third was stricken out, leaving the first count alleging common-law negligence and the second claiming a failure to observe the statutory precautions. A motion for a peremptory instruction was made for the defendant as to each count, both at the conclusion of plaintiff's evidence and at the conclusion of all the evidence.

The first assignment is that there is no evidence to support the verdict. The second, that a verdict should have been directed on the first common-law count, and the third assignment is that a verdict for defendant should have been directed as to the second or statutory count.

The facts bearing on the question of defendant's liability for common-law negligence are these: The fireman, W. H. McAmish, witness for defendant, on cross-examination testified as follows:

"I was riding in the cab on the left hand side at the time of the accident and was looking when we got to the crossing . . . I could see the automobile and did see it. . . . The car I was mostly paying attention to was the car following this one (the Harris car). I was paying more attention to the car following than I was to the Harris car for fear they might try to beat us. . . . The Harris car was probably fifty to seventy-five feet from the railroad track when I first saw it."

"Q. When you first saw it, you did not say anything to Floyd about it? A. No, I was expecting them to stop like people ought to.

"Q. But your experience is sometimes they stop and sometimes they don't stop? A. Sometimes they stop and sometimes they go on over. . . . I did not know what they would do . . . there is a difference in people about that.

"Q. After that you kept your eye on the car all the time from the time it got from fifty to seventy-five feet until it passed out of view? A. Yes, sir, until it passed out of view . . . The railroad track from rail to rail is about four feet nine inches wide and the cross ties extend a couple of feet on each side of the rails.

"Q. You say an automobile approaching that place there would have been struck when it got to the edge of the cross ties? A. Supposed to.

"Q. Even before it got to the end of the cross-ties it would have been in striking distance, within the sweep of the train? A. Yes, sir.

"Q. When it got to the cross-ties you had your eye on it? A. I had my eye on it all the time.

"Q. You didn't say anything to him (the engineer) about it? A. Yes sir, when the car got to the cross-ties, they got pretty near over it before the engine struck them. . . . It hit the rear of the car. It didn't hit the front.

"Q. When did you first tell the locomotive engineer to 'look out'? A. When I first seen them enter on the track.

"Q. You did not tell him until they got on the track? A. Sure not.

"Q. Then you told him to look out and it was too late? A. Yes sir, then it was too late. He saw what happened. I didn't.

.   .   .   .

"Q. Why didn't you give him (the engineer), notice that it (the car) was coming? A. How did I know they were not going to stop? I did not know whether they were going to stop or not. . . .

"Q. You could have whistled? It is not much trouble to blow the whistle? A. It is no use to whistle when people sees anything and don't heed it.

"Q. There is no reason in the world why you could not have told your engineer that they were getting pretty close to the track and if you had whistled they might have stopped. A. I did not have time to do that.

"Q. You say you saw it when it was fifty to seventy-five feet away? A. I saw it then, but, lord, I didn't know whether they were going to stop or not.

"Q. You could have told him then and he could have whistled, you were only going thirty-five miles an hour? A. He could have, yes sir.

"Q. The automobile was only going about eight miles an hour—it could have stopped? A. Yes, sir."

Just why this witness was paying more attention to the car some distance behind the Harris car than to the Harris car is not clear unless he thought the Harris car could and would beat the train across and that the second car was in danger. In that case a warning to the Harris car by blowing the whistle and to the engineer to check up were both important. If he thought it uncertain whether the Harris car would stop or not, the whistle was very important while there was time for it to stop. He says some one from the rear seat was looking at the engine. The proof shows beyond dispute that the curtains of the Harris car were up so that the only way any one on the rear seat could have looked at the engine would have been through the rear isinglass window. The train could not have been seen through a side window until too late to stop. The jury might well have concluded that the fireman's memory confused these two cars and that it was some one on the rear seat of the second car he saw looking at the engine.

Mrs. Jewell Harris says she did not see the train until after the collision. Defendant attempts to show that she did know of the near approach of the train by proof that she said just after the accident that her mother told her she "couldn't make it" and that if she had listened to her mother it would not have happened. On the strength of this evidence it is claimed that Jewell Harris was

guilty of contributory negligence, but this cannot be imputed to the guests. If they are barred it must be by their own contributory negligence. By reason of his infancy, Robert Harris cannot be affected by the question of contributory negligence. What Mrs. Vernie Harris saw, we do not know, but the attempt of defendant to prove contributory negligence as to Mrs. Jewell Harris reacts in favor of Mrs. Vernie Harris. If it be true that by listening to her mother the accident would have been averted, it must be that the mother tried to persuade the daughter to stop. The jury might have concluded that Mrs. Jewell Harris did not know of the approach of the train until too late to stop and that the whistle sounded when the train was say 200 feet and the car say seventy-five feet from the crossing would have caused her to stop, and might also have concluded that Mrs. Vernie Harris was not bound by contributory negligence. It was for the jury to say whether or not the conduct of the fireman was that of a reasonably careful and prudent man.

Ordinarily the guest may rely upon the driver and is not bound to object unless the danger is obvious. Whenever the question is debatable as to the negligence of the guest, it is a question for the jury. Tenn. Cent. R. Co. v. Vanhoy, 143 Tenn., 340.

There was certainly as much reason for holding the guest negligent in that case as in the present case.

The third assignment goes to the refusal of the court to give a peremptory instruction as to the statutory count. The fireman, McAmish, in his testimony set out supra, says he did not notify the engineer when the car got in striking distance of the train, but not until it got on the track. The engineer says that he did not see the car until the head end appeared on his side of the engine (the right hand side) on the track just at this time the fireman hollered "look out" and then he shut off steam and put on the emergency brakes.

Counsel for defendant Railway Company say this:

"Since the automobile lacked only six inches of clearing the track it travelled eighteen feet and three inches between the time it became an obstruction and the time it was actually struck. If it was running twelve miles an hour it travelled eighteen feet per second. If it was running fifteen miles per hour it travelled twenty-two and one-half feet per second, and if it was running twenty miles per hour it travelled thirty feet per second. In any event the automobile was not an obstruction ahead of the train for more than one second of time.

"If the train was running twenty-five miles per hour the lowest speed given by any witness, then it was travelling thirty-seven and one-half feet per second. If it was running thirty

miles per hour it was travelling forty-five feet per second, and if it was running thirty-five miles per hour it was travelling fifty-two and one-half feet per second.''

If then the car was running twelve miles an hour it was an obstruction on the track for about one second. If the train was making twenty-five miles an hour it had to run thirty-seven and one-half feet in this time. If making thirty miles an hour it had to run fifty-two and one-half feet in order to hit the car. Now if the car made eighteen feet in one second and only lacked time to make six inches more to escape, this would require but one-thirty-sixth of a second. Is it unreasonable to believe that the emergency brakes applied at thirty-seven and one-half to fifty-two and one-half feet from the crossing would have delayed the train more than that. The first jar of the brakes would mean more than that, otherwise it would not be perceptible. The engineer says it was not possible to stop the train before reaching the crossing after the car became an obstruction on the track, but he does not say the train could not have been delayed more than one-thirty-sixth of a second in order to give the car time to escape. To say the least of it, there was enough to justify the court in leaving the case to the jury upon the statutory count, and there is enough evidence to justify the jury in finding that timely warning by the fireman to the engineer and quick action by the engineer would have avoided the collision. It was for the jury to say whether the statute had been complied with or not.

Witnesses on the train felt the jar of the brakes taking effect at the instant of striking the car. That jolt meant that the speed of the train was suddenly checked. It was then too late to save the car. But suppose the signal had been given and the brakes applied at forty or fifty feet away, can any one doubt that time enough would have been given the car to run much more than six inches?

''The statute requiring railroad companies to keep some person on their locomotives always on the lookout ahead and when any person, animal or other obstruction appears upon the road to observe the statutory precautions and employ every means possible to stop the train and prevent an accident, is imperative and mandatory.'' Railroad v. Brooks, 17 Cates, 260, 264, 267.

''It is a positive and imperative duty of the engineer or other person in charge to comply with the requirements and precautions of the statute as soon as a person is seen on the track, and the statute does not allow the slightest speculation upon things that are probable or possible, but demands absolute obedience to the provisions of the statute.'' Hill v. Rail-

road, 9 Heisk., 823, 827; Railroad v. Foster, 4 Pick., 679; Railroad v. Cates, 17 Cates, 265.

"If the engineer cannot see, the fireman must." N. & C. R. R. v. Nowlin, 1 Lea, 525.

"Where the plaintiff is guilty of gross contributory negligence, and where the Railroad has failed to observe the statutory precautions, the plaintiff may still recover substantial damages." Railroad v. Overcast, 3 Hig., 235, 241, 244; Railroad v. Binkley, 19 Cates, 83, 86, 88; Railroad v. Nowlin, 1 Lea, 524; Sanders v. Railroad, 15 Pick., 130, 136; Rapid Transit Co. v. Walton, 21 Pick., 420; Note 116, Sec. 1574 of the Code.

It is not necessary to cite authority to the effect that the lookout must be vigilant and diligent. Nor to the effect that the word "road" used in the statute means within striking distance of the track. The fireman admits he did not warn the engineer when the car first appeared in striking distance of the train and the engineer says when he received the warning from the fireman the car had appeared on his side of the engine. It was for the jury to say whether or not, between the fireman and engineer the brakes were put on as soon as they should have been and whether these employees of the railway used every possible means to prevent the accident. The question was properly left to the jury and there is evidence to support the verdict.

The fourth assignment criticises the charge in its statement of the contention of defendant. We do not think the charge could be misunderstood. It abbreviated the statement of defendant's position, but stated the substance of it.

The fifth assignment is that the court erred in charging the jury as follows:

"It was the duty of the defendant to maintain a lookout for persons approaching said railroad crossing and to exercise ordinary care to warn or attempt to warn such travelers of the approach of the train and if defendant failed to do so, then the defendant was guilty of negligence, and if· such negligence, if any, on the part of defendant was the proximate cause of said collision and the resulting consequences, the defendant is liable under the first count of said respective declarations to the plaintiff or plaintiffs, if any, thus injured, or so damaged."

This assignment does not point out wherein the error in this charge consists, but passing this, we see no objection to the charge as to the care imposed on defendant at a crossing under common-law rules, but even if it should be erroneous, the error would not be material, because whether it was obligatory on defendant to

keep a lookout in order to safeguard persons approaching at a crossing, the proof shows that the fireman did see the car approaching and it was a question for the jury whether or not the facts brought the case within the rule of discovered peril.

Assignments six to fifteen inclusive, predicate error upon the refusal of the court below to give in charge to the jury, requests for instructions by defendant, numbered from one to eleven inclusive, with the exception of No. 5.

Request No. 1 was given in substance by the court in different form. The same may be said of Request No. 2 and in addition, that no proof in the record shows any infirmity of sight or hearing in any of the parties in the car, therefore a part of the charge was uncalled for. Request No. 3, assignment eight was covered by the general charge. Request No. 4, assignment nine as applied to both counts and all three of the plaintiff's without distinction was properly refused. Request No. 6 assignment ten was not called for by the proof. At the conclusion of all the proof it was made clear that no contention was made by the plaintiffs which required this special request for the protection of the defendant. Charge No. 8 assignment eleven as applied to both counts and all the plaintiffs was not proper. The subject-matter of the request was treated more correctly in the general charge. Request No. 9, assignment twelve, ignores the contention under count one that the car was seen by the fireman long before it reached the track and under count two that it was seen by the fireman in actual striking distance in time to have saved the collision. The same may be said of Request 10, assignment thirteen. Neither of these requests are limited to the statutory count. Request No. 7, assignment fourteen, was limited to the common-law count and to Mrs. Vernie Harris and therefore different from most of the requests. However, the court had charged the jury briefly and correctly as to the very contention set out with great elaboration in this request. The court below cannot be put in error for refusing this request. Request No. 11, assignment fifteen, was covered in different form in the general charge.

Many of these special requests do not distinguish between the different counts of the declaration or between the different plaintiffs. Many of them were evidently directly aimed at the Jewell Harris suit which was tried with the others below, but is not before this court. After comparing requests refused, with the charge given, we have concluded that there is no reversible error set out in these assignments.

It follows that all assignments of error are overruled and the judgment of the lower court is affirmed. Appellant and surety on appeal bond will pay costs of appeal.

Owen and Senter, JJ., concur.