RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 05a0106p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ANNETTE RUSH, as natural mother of Johnathan
Rush, a minor,

*Plaintiff-Appellant,*

*v.*

ILLINOIS CENTRAL RAILROAD COMPANY, aka
Canadian National-Illinois Central Railroad,

*Defendant-Appellee.*

No. 02-5118

---

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 00-02797—Bernice B. Donald, District Judge.

Argued: March 17, 2004

Decided and Filed: March 4, 2005

Before: NORRIS and COLE, Circuit Judges; ECONOMUS, District Judge.[*]

---

## COUNSEL

**ARGUED:** Daniel Alan Seward, Memphis, Tennessee, for Appellant. Harold W. McLeary, Jr., SMITH, SABBATINI & MCLEARY, Memphis, Tennessee, for Appellee. **ON BRIEF:** Daniel Alan Seward, Memphis, Tennessee, for Appellant. Harold W. McLeary, Jr., W. Bradley Gilmer, SMITH, SABBATINI & MCLEARY, Memphis, Tennessee, for Appellee.

---

## OPINION

---

PETER C. ECONOMUS, District Judge.

## I.    OVERVIEW

This appeal arises from a diversity action brought by the plaintiff-appellant, Annette Rush, following her nine-year-old son's fall from a railcar owned and operated by the defendant-appellee, Illinois Central Railroad Company ("CN-IC"). The plaintiff-appellant challenges the district court's

---

[*]The Honorable Peter C. Economus, United States District Judge for the Northern District of Ohio, sitting by designation.

denial of her motion for new trial following a jury verdict awarded in favor of CN-IC. She advances four arguments on appeal: (1) the district court erroneously admitted into evidence at trial the prior statements of two witnesses and audio recordings of those statements; (2) the jury erred in not finding CN-IC liable under Tennessee's "Lookout Statute"; (3) the jury disregarded the trial court's instruction to presume the nine-years-old child incapable of negligence as required under Tennessee law; and (4) the district court erred in denying the motion for new trial because the verdict was against the clear weight of the evidence.

For the reasons that follow, we **AFFIRM** the judgment of the district court.

## II.     BACKGROUND

### *CN-IC's switching operation*

CN-IC conducts a switching operation in Memphis, Tennessee. During the switching operation, CN-IC employees hook and unhook railcars (a process know as "coupling") to a locomotive engine. The locomotive engine then delivers the railcars to nearby destinations.

A three person crew performs the switching operation. An employee referred to as a "brakeman" physically couples and uncouples the railcars at each stopping point. The "locomotive engineer" operates the engine along the rail line. The "conductor" oversees the entire switching operation. All three CN-IC employees are responsible for the safety of the crew and passersby. *See* (Trial Transcript, Volume I at 102-04, 132-33, 152, 211-14, 221-22, 232); (Trial Transcript, Volume II at 17, 34-35, 54); (Trial Exhibits ## 3, 9).[1]

### *Johnathan Rush's Fall and the CN-IC Investigation*

Nine-years-old Johnathan Rush ("Rush") and several friends — Quan Reed ("Reed") (age 11), Doyle Lockett ("Lockett") (age 10), Darrell Moore ("D. Moore") (age 9), and Justin Moore ("Moore") (age 8),[2] — encountered the switching operation on November 10, 1996. While the subsequent events are in dispute, it is uncontroverted that Rush, D. Moore and Reed began playing near a CN-IC train. At some point during these activities, Rush fell under the train and sustained injuries that ultimately required a below-the-knee amputation of his left leg.

Within several hours of the accident, Tom Martin ("Martin"), a Risk Manager and Railroad Police Officer for CN-IC, interviewed Lockett, D. Moore and Moore as to the earlier day's events. Each interviewee purportedly informed Martin that Rush fell while attempting to jump onto a moving train. Martin audio-recorded these statements and later transcribed the interviews (hereinafter the "interview transcript"). *See* (Tr., Vol I. at 338); (Tr. Exs. ## 1&2).

### *The Underlying Action*

Annette Rush, as the natural mother and next of kin of Johnathan Rush, filed a diversity action against CN-IC in the United States District Court for the Western District of Tennessee alleging common law negligence and violations of Tennessee's "Lookout Statute," TENN. CODE ANN. § 65-12-108. The matter proceeded to trial whereby the parties presented widely divergent

---

[1] References to the trial transcript will hereinafter be cited as ("Tr., Vol. I at __") or ("Tr., Vol. II at __"). Volume II of the trial transcript recites the testimony provided at trial during the afternoon of October 30, 2001. Volume I of the trial transcript provides all other trial testimony. References to the exhibits admitted at trial will hereinafter be cited as ("Tr. Ex. # __").

[2] Lockett, D. Moore and Moore are siblings.

accounts of the events giving rise to the accident.  As the issues raised in this appeal turn on an examination of the conflicting evidence presented to the jury, we shall recount that evidence in detail.

### *The Plaintiff-Appellant's Witnesses*

The plaintiff-appellant called Lockett as her first witness.  Lockett testified on direct examination that he and a group of friends encountered an "abandoned," (Tr., Vol. I at 38), and "parked,"(Tr., Vol. I at 41), train while walking from the home of his grandfather.  He further testified that Rush and two other young men climbed the side ladder of the train's railcar.  *See* (Tr., Vol. I at 39).  According to Lockett, the train began to move without warning, and two of the young men jumped off of the railcar.  *See* (Tr., Vol. I at 41-42). Rush, however, appeared too "scared to jump off," (Tr., Vol. I at 42), and soon fell from the ladder.

On cross-examination, the following colloquy occurred between counsel for CN-IC and Lockett:

> Q.    Do you remember after this accident that a police officer, a female police officer, Sergeant Halfacre, came to your home along with Mr. Martin over there?
>
> A.    Not that I recall.
>
> Q.    You don't recall that?
>
> A.    I recall a police officer bringing me home, not no woman though.
>
> Q.    Do you remember that Sergeant Halfacre and Mr. Martin talked to you with your aunt present?
>
> A.    No sir.
>
> Q.    Okay.  Do you remember that you told, in the presence of your aunt, that you told Mr. Martin and Sergeant Halfacre of the Memphis Police Department that you were playing around the train yard when Johnathan got hurt, and that you saw Johnathan running alongside the train to get on, do you remember telling them that?
>
> A.    No, sir.

(Tr., Vol. I at 46-47.)  Counsel for CN-IC immediately attempted to play  the audio recording of Lockett's post-accident statement.  The district judge, however, interrupted the cross-examination and instructed defense counsel to first confront Lockett with the interview transcript.[3]

---

[3]Counsel for the plaintiff-appellant objected on the grounds that the transcript was "unsigned" and hearsay. *See* (Tr., Vol. I at 48-49). The district court overruled the objection, stating:

> [T] his witness has denied ever talking to a police officer, and so since he — [] has made a blanket denial Mr. McLeary has a right to confront him.
>
> I'm going to allow you to confront him with the transcript. If [Lockett] denies it, you still can play the tape, then we will address the issue of the transcript coming in.

(Tr., Vol. I at 49.)

Counsel for CN-IC handed the interview transcript to Lockett. After Lockett silently read the writing, counsel for CN-IC enquired, "Is that correct what you said on the afternoon of this accident, November the 10th of 1996, is that correct?" (Tr., Vol. I at 52.) Lockett responded, "Yes, sir." (Tr., Vol. I at 52.)

Lockett then read the transcript aloud whereby the jury heard his prior statement that "Johnathan [was] running alongside the train."[4] (Tr., Vol. I at 52-53); (Tr. Ex. # 1). Lockett further testified, however, that Rush was not "running along side the train, the train wasn't moving." (Tr., Vol. I at 54.) Counsel for CN-IC re-read Lockett's prior statement from the interview transcript and enquired: "Why did you tell Mr. Martin on the afternoon of the accident that Johnathan was trying to run alongside the train?" (Tr., Vol. I at 55.) Lockett responded, "I just misunderstood the question, I guess." (Tr., Vol. I at 55.)

On re-direct examination, counsel for the plaintiff-appellant queried whether Lockett observed Rush running alongside the train trying to jump on. *See* (Tr., Vol. I at 58). Lockett again responded in the negative and repeated his testimony that the train was stopped when Rush began playing on the railcar. *See* (Tr., Vol. I at 59).

The plaintiff-appellant called Moore as her next witness. Moore echoed Lockett's testimony that the train was "parked" and "stopped" when Rush began playing on the railcar. (Tr., Vol. I at 65-66.) Moore further testified that he never observed Rush running alongside the train. *See* (Tr., Vol. I at 70).

On cross-examination, Moore denied any memory of meeting with Martin and a Memphis Police Department Officer. *See* (Tr., Vol. I at 74). Counsel for CN-IC handed Moore the interview transcript; however, the writing did not refresh Moore's recollection of the post-accident interview. *See* (Tr., Vol. I at 75-76). Counsel for CN-IC did not pose any further questions to Moore.

The plaintiff-appellant successively called as witnesses each member of CN-IC switching crew. The locomotive engineer, William Knight ("Knight"), and the brakeman, Basil White ("White"), each testified that they did not observe any persons near the CN-IC railroad tracks on the date of Rush's accident.[5] *See* (Tr., Vol. I at 134-148, 270). Knight additionally testified that it was

---

[4]Lockett read the following except from the transcript:

| [Martin to Lockett] | Okay. Y'all were playing over around Pear Street in the railroad tracks in that area? |
| [Lockett] | No, sir. |
| [Martin] | No? |
| [Lockett] | We played in my grandaddy's yard first. |
| [Martin] | Okay, well just before Johnathan got hurt when he was trying to get on the train, you were right by the railroad tracks, weren't you, or pretty close to it? |
| [Lockett] | Yes sir. |
| [Martin] | You could see it? Okay, and did you see Johnathan running alongside the train trying to get on? |
| [Lockett] | Yes sir. |
| . . . . | |
| [Martin] | Did you know that you could get hurt around a train? |
| [Lockett] | Yes, sir. |

(Tr., Vol. I at 52-53); (Tr. Ex. # 1).

[5]The plaintiff-appellant called Martin as a witness following White's testimony. Counsel for the plaintiff-appellant posed limited questions to Martin regarding the investigation of the accident. *See* (Tr., Vol. I at 298-328). As discussed *infra*, the challenged portions of Martin's testimony arose when he was called as a defense witness.

his practice to sound the train's bells and horn prior to initiating any movement of engine; although, he did not recall his specific behavior on the date of Rush's fall. *See* (Tr., Vol. I at 147). The train's conductor, Christopher Giannini ("Giannini"), likewise testified that it was the switching crew's practice to sound the bells and horn before moving along the rail line. *See* (Tr., Vol. II at 44). Giannini could not remember, however, whether the bells and horn sounded prior to Rush's fall. *See* (Tr., Vol. II at 44). Giannini went on to testify that on the date of the accident he observed two males, between the ages of eight to eleven years old, standing approximately fifteen feet away from the moving locomotive engine. *See* (Tr., Vol. II at 38-45). Giannini expressed his belief that the young males "were standing at the side, far enough that they didn't pose any hazard to us." (Tr., Vol. II at 45.)

Jimmy Calvin Scott ("Scott"), testifying as an expert in the area of railroad operations and safety,[6] opined that when Giannini observed two young males near the railroad tracks, the CN-IC switching crew should have stopped the train and attempted to remove the children from the tracks. *See* (Tr., Vol. I at 386). Scott further opined that there lacked any evidence that the CN-IC switching crew sounded the bells or horn prior to Rush's accident.[7] *See* (Tr., Vol. I at 387-88). Scott concluded that these omissions constituted violations of CN-IC's internal safety regulations. *See* (Tr., Vol. I at 384, 387-88).

The plaintiff-appellant concluded her proof with Rush's testimony.[8] Rush testified that he encountered a "still" train while returning from the home of Lockett's grandfather. *See* (Tr., Vol. II at 83). He further testified that his purpose for climbing on the train was to "ride it home." (Tr., Vol. II at 84.) However, the train began to move without warning, *see* (Tr., Vol. II at 86), and Rush "got scared,"(Tr., Vol. II at 87). His leg then "slipped off,"(Tr., Vol. II at 87), and he fell under the train. Rush concluded his direct testimony by informing the jury that he recalled lying in the rocks near the railroad tracks "bleeding, bleeding." (Tr., Vol. II at 87.)

*Martin's Audio Recording of the Statements Made by Lockett and Moore*

Prior to commencing its case-in-chief, CN-IC informed the district court that it intended to introduce into evidence Martin's audio recordings of the post-accident interviews. The plaintiff-appellant repeatedly objected on grounds that these prior statements were hearsay. *See* (Tr., Vol. I at 338-39, 344, 346). She further objected on the basis that CN-IC had not properly authenticated the audio recordings. *See* (Tr., Vol. I at 338-39, 344, 346). The district court enquired as to purpose underlying CN-IC's request to play the audio recordings. *See* (Tr., Vol. I at 347). Counsel for CN-IC responded:

> I asked each one of the young men [Lockett and Moore] what you were doing out there. And to my surprise these young men said that the train was not moving and that Johnathan had climbed on the train.

---

[6]CN-IC objected to the entirety of Scott's testimony. *See* (Tr., Vol. I at 379). The district court overruled the objection, *see* (Tr., Vol. I at 379), and the parties have not raised the issue on appeal.

[7]Scott specifically testified that the CN-IC train did not have an "event recorder," a machine designed to record all of the train's operations, including whether or not the train's bells and horn had been sounded. *See* (Tr., Vol. I at 388). Martin later explained that "event recorders" were new devices at the time of Rush's accident and there lacked any regulation requiring their placement on trains performing switching operations. *See* (Tr., Vol. I at 317).

[8]The plaintiff-appellant also introduced the testimony of two medical experts, an economist, and a vocational expert for the purposes of quantifying Rush's damages. The plaintiff-appellant does not raise the issues of damages on appeal; indeed, she has elected to brief the limited issue of liability. *See* (Final Br. of Appellant at 24-25 n.1).

> And in each of these statements the young men, Doyle [Lockett] and Justin [Moore], say that — say that Johnathan [Rush] was running alongside the train trying to catch hold of it.
>
> And that contradicts the sworn testimony of Johnathan, these do, taken the afternoon of the accident.
>
> But as I said, I was surprised when they walked into the courtroom here all of sudden it is the same as Johnathan, so that's the sole purpose.

(Tr., Vol. I at 347-48.)

At the request of the plaintiff-appellant, the district court conducted an evidentiary hearing regarding the audio-tapes outside of the jury's presence. Martin testified during the hearing that he recorded Lockett and Moore's statements several hours following the accident. *See* (Tr., Vol. I at 492-93). Martin further testified that he could not independently identify the voices on the audio recordings. *See* (Tr., Vol. I at 497-98); *see also* (Tr., Vol. I at 563) ("Without the identification of the names as I spoke to them, I couldn't have just listened to their voice and not heard their name and told you who it was . . . ."). In light of this testimony, the district court determined that the audio-taped statements were admissible for the limited purpose of impeaching the testimony of Lockett and Moore.[9] *See* (Tr., Vol. I at 499-500). Accordingly, the district court ordered CN-IC to introduce into evidence only those parts of the audio-recordings pertaining to Moore and Lockett's purported prior inconsistent statements. Because the jury would be permitted to review the admitted exhibits during their deliberations, the district court ordered CN-IC to erase all other statements found on the audio-tapes.

### *The Defendant-Appellee's Witnesses*

CN-IC called Martin as its first witness. Martin briefly recounted the factual circumstances giving rise to his interviews of Lockett and Moore. At defense counsel's instruction, Martin played the audio recordings of the interviews during which the jury heard Moore's prior statements that none of the young men ever climbed onto the CN-IC railcar and that Johnathan fell while running

---

[9]In overruling the plaintiff-appellant's objections, the district court reasoned:

> Well I think that would apply [Rule 901 of the Federal Rules of Evidence] if you had a tape where there we no names designated, those voices would need to be identified, but here the questionnaire says this is such and such, and then talking such and such, and he asks that person questions. So you do have – the identification.
>
> Whether or not this witness can go back independently and name those voices is really not required so long as there is no evidence that the tape has been tampered with, that there has been no deletions or exclusions or anything of that nature.
>
> So I understand your argument, having heard the testimony, I'm inclined to and will rule that the defense can use those portions of the tape for those witnesses whom appeared in the courtroom and who have testified.

(Tr., Vol. I at 502.)

alongside the train.[10]  *See* (Tr. Ex. # 33).  The jury again heard Lockett's prior statement that Johnathan was running alongside the train in an effort to catch it home.  *See* (Tr. Ex. # 33).

CN-IC called Jim Tyson ("Tyson"), a semi-tractor trailer operator, as its second and final witness. Tyson testified that, on the date of Rush's accident, he was awaiting in his semi-tractor trailer for the CN-IC train to pass through an intersection when he observed a group of young men walking alongside of the stopped train.  *See* (Tr., Vol. I at 578, 581).  Tyson recalled that after the train began to move, two of the young men came knocking at his window yelling that their friend had been involved in an accident.  *See* (Tr., Vol. I at 580).  Tyson informed the jury that he called for an ambulance to assist the injured young man.  *See* (Tr., Vol. I at 580-81).

### *The Jury's Verdict and the Post Trial Proceedings*

The district court subsequently instructed the jury on the applicable law and standards to be employed in rendering a verdict.  Neither party objected to the jury instructions.

The jury returned a verdict in favor of CN-IC.  The plaintiff-appellant thereafter moved for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure raising multiple evidentiary issues and challenging the jury's verdict.  The district court denied the motion and entered judgment in favor of CN-IC.

The instant appeal ensued.

## III.    LAW AND ANALYSIS

### A.    Evidentiary Issues

The plaintiff-appellant's first assertion on appeal is that the district court erroneously permitted defense counsel to cross-examine Lockett and Moore with the interview transcript.  The plaintiff-appellant further asserts that the district court erred by permitting the jury to hear the audio recordings of those interviews.

---

[10]The interview transcript indicates that jury heard the following statement from Moore, in pertinent part:

| | |
|---|---|
| [Martin to Moore] | Did Johnathan Rush, the one that got his foot mashed, is he the only one that actually jumped on the train? |
| [Moore] | They jumped on, that (inaudible) he's running with it on his side (inaudible) and another boy lived down there and Johnathan, had they hands on it like this running with it, so I told him I was scared to get on and he was, cause he was going like that, going fast a little bit.  So he had fell, he had fell on it. |
| [Martin] | All right, did Johnathan fall while he was running, so he never did get on the train? |
| [Moore] | Ain't nobody get on it, he fell, he fell. |
| [Martin] | Okay, okay |
| [Moore] | He was holding onto it running like that. |

(Tr. Ex. # 2.) While the transcript never was introduced into evidence at trial, our review of the audio-tape and transcript reveals that the transcript accurately records Moore's statements.  Consequently, we can reasonably conclude that the jury heard the foregoing statements during the playing of the audio-tape.

We review a district court's contested evidentiary determinations for an abuse of discretion.[11]  *See Beck v. Haik*, 377 F.3d 624, 636 (6th Cir. 2004).  An abuse of discretion occurs where "the district court clearly erred in its judgment after weighing the relevant factors, improperly applied the correct law, or inappropriately used the wrong legal standard." *Shanklin v. Norfolk S. Ry. Co.*, 369 F.3d 978, 988 (6th Cir. 2004).

The threshold question to be considered when confronted with an evidentiary challenge on appeal is whether an evidentiary error occurred during the trial.  *See Beck*, 377 F.3d at 635-36.  "If so, then we 'examine the proceedings in their entirety[]' in the light of the proofs at trial, to determine whether the errors affected substantial rights." *Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750, 762 (1946)).  We must have a "fair assurance" that the trial's outcome was not altered by error in order to affirm the judgment. *Schrand v. Federal Pacific Elec. Co.*, 851 F.2d 152, 157 (6th Cir. 1988).

> **1.        Whether an evidentiary error occurred when defense counsel cross-examined Lockett and Moore with a transcript of the post-accident interviews**

The plaintiff-appellant contends that the district court erroneously permitted defense counsel to cross-examine Lockett and Moore with the interview transcripts.  CN-IC counters that it utilized the interview transcripts to refresh the witnesses' memory pursuant to Rule 612 of the Federal Rules of Evidence.

Rule 612 of the Federal Rules of Evidence authorizes a party to refresh a witness's memory with a writing so long as the "adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness." FED. R. EVID. 612.  The propriety of permitting a witness to refresh his memory from a writing prepared by another largely lies within the sound discretion of the trial court.  *See United States v. Faulkner*, 538 F.2d 724, 727 (6th Cir. 1976) (citations omitted).

> Proper foundation requires that the witness's recollection to be exhausted, and that the time, place and person to whom the statement was given be identified.  When the court is satisfied that the memorandum on its face reflects the witness's statement or one the witness acknowledges, and in his discretion the court is further satisfied that it may be of help in refreshing the person's memory, the witness should be allowed to refer to the document.

*United States v.Shoupe*, 548 F.2d 636, 641 (6th Cir. 1977) (quoting *Goings v. United States*, 377 F.2d 753, 760 (8th Cir. 1967)) (quotation marks and added emphasis omitted).  Upon establishing the proper foundation, "counsel will typically offer the witness the writing to inspect, and will show a copy of the writing to the opposing parties."  4 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 612.03[4][a][i] (Joseph M. McLaughlin ed., 2d ed. 2004) [hereinafter WEINSTEIN'S FEDERAL EVIDENCE] (citations omitted).  "The best practice is for the trial

---

[11]We note that our precedent establishing the standard of review over district court determinations of hearsay is somewhat confounding. *Compare United States v. Wright*, 343 F.3d 849, 865 (6th Cir. 2003) ("All evidentiary rulings, including hearsay, are reviewed for abuse of discretion.") *with Field v. Trigg*, 386 F.3d 729 (6th Cir. 2004) ("[W]e review de novo a district court's conclusions of law, such as in this case, whether evidence offered at trial constituted hearsay within the meaning of the Federal Rules of Evidence.").  However, recent published precedent indicates that where, as here, the evidentiary issues to be examined concern the impeachment of witnesses, we review the district court's determination under an abuse of discretion standard. *See United States v. Foster*, 376 F.3d 577 (6thCir. 2004) (applying an abuse of discretion standard of review to the district court's determination that evidence constituted prior inconsistent statements pursuant to Rule 613 of the Federal Rules of Evidence).

court to have the witness silently read the writing and then to state whether the writing has refreshed his or her recollection." *Id.*

### The cross-examination of Moore

The plaintiff-appellant's assertion that defense counsel improperly utilized the interview transcript to refresh Moore's recollection warrants little attention. Moore repeatedly testified that he did not remember meeting with Martin following the accident. *See* (Tr., Vol. I at 74-76). Having exhausted Moore's memory during cross-examination, defense counsel presented Moore with the interview transcript. After Moore silently read the writing, the district court posed the following questions:[12]

> Q.     Now Justin, having – having looked at it, having read it, do you recall now whether or not you had a conversation and made any statements to anyone about this accident?
>
> A.     No, ma'am, because –
>
> Q.     Okay. Now you – that – that statement that he just handed you doesn't refresh your recollection about whether or not you gave an interview to Sergeant Halfacre and Mr. Martin.
>
> A.     No, ma'am, because back then we didn't call him Johnathan, I didn't know his name back then, his real name.

(Tr., Vol. I at 75-76.) Defense counsel promptly concluded the cross-examination.

No evidentiary error occurred during the attempt to refresh Moore's memory. Defense counsel established a proper foundation by repeatedly inquiring whether Moore recalled meeting with Martin following the accident. *See Shoupe*, 548 F.2d at 641-42 (finding that counsel established a proper foundation under Rule 612 where counsel "properly used leading questions to establish the time, place and person to whom [the witness] had allegedly made his prior, unsworn statements"). The subsequent procedures employed by the district court were consistent with the well-established mandates of Rule 612. Indeed, the district court intervened in the cross-examination to ensure that the inadmissible contents of the writing were not presented to the jury.[13] Furthermore, defense counsel terminated the cross-examination when it appeared that the transcript failed to refresh Moore's memory.[14] *Accord* 4 WEINSTEIN'S FEDERAL EVIDENCE § 612.03[4][a][iii] ("If, after consulting a writing used to refresh recollection, the witness's memory is not revived,

---

[12]*See* FED. R. EVID. 614(b) ("The court may interrogate witnesses, whether called by itself or by a party.").

[13]Defense counsel passed the transcript to Moore and requested that Moore read the writing aloud. The district court interjected and issued the following proper instruction:

> You cannot read that to the jury, yet, sir, because the witness has denied ever giving that statement. You may read it silent[ly] to yourself, and if you recall then making such a statement then I will let you read it to the jury. But right now the witness has denied making any such statement, so read it to yourself.

(Tr., Vol. I at 75.)

[14]The plaintiff-appellant alleges in her brief that defense counsel read aloud the contents of the transcript during the cross-examination. *See* (Final Br. of Appellant at 35). Our review of the record reveals that this allegation lacks any factual support.

Rule 612 is inapplicable. Thus it would be error for the trial court to admit into evidence testimony about a matter included in the writing if the witness had no recollection of the matter after viewing the writing."). We therefore find no evidentiary error arising from the attempt to refresh Moore's memory with the interview transcript.

### *The cross-examination of Lockett*

We reach a different conclusion regarding the attempts to refresh Lockett's memory of the post-accident interview. As with the cross-examination of Moore, defense counsel attempted to exhaust Lockett's memory by posing leading questions regarding the time, date and place of the post-accident interview. Lockett repeatedly responded that he did not remember meeting with Martin. Defense counsel, however, did not attempt to immediately refresh Lockett's memory of the meeting with the interview transcript. Instead, defense counsel posed the following question:

> Okay. Do you remember that you told, in the presence of your aunt, that you told Mr. Martin and Sergeant Halfacre of the Memphis Police Department that you were playing around the train yard when Johnathan got hurt, and that you saw Johnathan running alongside the train to get on, do you remember telling them that?

(Tr., Vol. I at 47.)

While we have authorized the use of leading questions to establish a witness's lack of memory as to a particular event, we have cautioned that the trial court may abuse its discretion when otherwise inadmissible evidence is introduced to the jury through the guise of refreshing a witness's recollection. *See Shoupe*, 548 F.2d at 641 ("[W]e find no precedent sanctioning the recitation in the presence of the jury of extended unsworn remarks. . . . ."). Rule 103(c) of the Federal Rules of Evidence provides that a jury trial shall be conducted "to prevent inadmissible evidence from being suggested to the jury by any means, such as . . . asking questions in the hearing of the jury." FED. R. EVID. 103(c). The Advisory Committee's Note to Rule 103(c) indicates that the rule "proceeds on the supposition that a ruling which excludes evidence in a jury case is likely to be a pointless procedure if the excluded evidence nevertheless comes to the attention of the jury." FED. R. EVID. 103(c), advisory committee notes. Defense counsel's question demonstrated that he failed to understand the impropriety of attempting to refresh Lockett's recollection by incorporating into his question the otherwise inadmissible contents of the writing – i.e, that "Johnathan was running alongside the train to get on."

Lockett's subsequent testimony exacerbated the potential evidentiary error caused by defense counsel's improper question. After silently reading the interview transcript,[15] Lockett testified that his memory was refreshed and that the writing accurately reflected his prior statements. *See* (Tr., Vol. I at 52). He then read aloud from the interview transcript whereby the jury heard his prior statement that "Johnathan was running alongside the train trying to get on." *See* (Tr., Vol. I at 53); (Tr. Ex. # 1). However, Rule 612 requires a witness whose memory has been refreshed to testify from his present recollection, rather than to merely restate the contents of the writing.[16] *See Shoupe*, 548 F.2d at 642 ("[I]f a party can offer a previously given statement to substitute for a witness'

---

[15] Defense counsel immediately requested Lockett to read the transcript in front of the jury. The district court intervened and instructed: "No, I don't want him to read anything out loud just yet. I want him to look at that and determine whether or not he recalls being asked those questions and giving those answers." (Tr., Vol. I at 51.)

[16] We recognize that there are limited circumstances in which the witness may *refer* to the writing used to refresh recollection while testifying, such as where the witness "is asked to testify about detailed or lengthy matters," 4 WEINSTEIN'S FEDERAL EVIDENCE § 612.04[4][a] (citations omitted), or where the testimony pertains to matters that occurred during the relatively distant past.

testimony *under the guise of 'refreshing recollect*,' the whole adversary system of trial must be revised.") (Internal quotation and citation omitted); *Faulkner*, 538 F.2d at 727 ("[C]aution must be exercised to insure that the document is not used to put words into the mouth of the witness."). *See also* 4 WEINSTEIN'S FEDERAL EVIDENCE § 612.02[2] ("Rule 612 is intended to curb the false memory that might occur when a witness who purports to testify based on a refreshed recollection merely parrots the contents of the writing.") (citing *Hall v. American Bakeries Co.*, 873 F.2d 1133,1136 (8th Cir. 1989)).

It is the witness's present refreshed recollection – as opposed to the contents of the writing used to refresh memory — that is the substantive evidence of the matter at issue. *See United States v. Humphrey*, 279 F.3d 372, 377 n.3 (6th Cir. 2002) (citing *Faulkner*, 538 F.2d at 727). While defense counsel ostensibly utilized the writing to refresh Lockett's present recollection of the interview, the query posed following Lockett's silent review of the writing targeted only whether the interview transcript accurately recounted Lockett's prior, out-of court statements. *See* (Tr., Vol. I at 52) ("Is that correct what you said on the afternoon of this accident, November the 10th of 1996, is that correct?"). Remarkably, defense counsel did not enquire whether the interview transcript refreshed Lockett's recollection of the matter at issue; namely, the post-accident interview. Defense counsel instead instructed Lockett to read, in the presence of the jury, the prior, unsworn statements contained in the interview transcript. We thus reach the inescapable conclusion that defense counsel impermissibly utilized the "guise of refreshing recollect," *Shoupe*, 548 F.2d at 642, to place before the jury Lockett's prior, out-of-court statements regarding the manner in which Rush fell from the CN-IC train.

It follows that defense counsel's attempt to use Lockett's out of court statements as substantive evidence of the manner in which the accident occurred is governed by the rules of evidence addressing the use of hearsay. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," FED. R. EVID. 801(c), which "is not admissible except as provided by the [Federal Rules of Evidence]," FED. R. EVID. 802. CN-IC contends on appeal that Lockett's prior, out of court statements were admissible pursuant to the recorded recollection hearsay exception of Rule 803(5). *See* (Final Br. of Appellee at 27).

CN-IC misplaces its reliance on the recollection recorded exception to the hearsay rule. Rule 803(5) allows a document to be read to the jury as a past recollection recorded if "(1) the witness once had knowledge about the facts in the document; (2) the witness now has insufficient memory to testify about the matters in the document; and (3) the document was recorded at a time when the matters were fresh in the witness's mind and the document correctly reflects the witness's knowledge of the matters." *United States v. Smith*, 197 F.3d 225, 231 (6th Cir. 1999) (citing *United States v. Porter*, 986 F.2d 1014, 1016 (6th Cir. 1993)). Under CN-IC's application of the recorded recollection exception, the interview transcript served to stand in the place of Lockett's "insufficient memory" of the accident. However, Lockett provided detailed and lengthy testimony at trial regarding the events prior to, during, and immediately following the accident. It therefore would be erroneous to conclude that Lockett had "insufficient memory to testify about the matters" in the interview transcript. Indeed, CN-IC concedes in its brief that Lockett had sufficient memory of the accident. *See* (Final Br. of Appellee at 28) ("In the case of Doyle Lockett, the witness only read his statement to the jury after stating it refreshed his collection."). Accordingly, the past recollection recorded exception to the hearsay rule is wholly inapplicable to Lockett's prior statements regarding the accident.

We likewise reject CN-IC's attempts to invoke the residual exception to the hearsay rule. Rule 807 provides, in pertinent part:

> A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

FED. R. EVID. 807.   This rule explicitly requires that the evidence must have "equivalent circumstantial guarantees of trustworthiness" as compared to evidence admitted under the other hearsay exceptions contained in Rules 803 and 804. FED. R. EVID. 807; *see United States v. Barlow*, 693 F.2d 954, 962 (6th Cir. 1982).  "In addition, as stated by the rule, the evidence admitted must go to a 'material fact,' must be more probative than any other evidence that reasonably could have been procured, and its admission must support the general purposes of the Rules of Evidence and 'the interests of justice.'" *United States v. Darwich*, 337 F.3d 645, 659 (6th Cir. 2003) (quoting FED. R. EVID. 807).

CN-IC has made no showing, and the district court made no finding, that Lockett's prior statement, as introduced through the reading of interview transcript, meets the requirements of Rule 807, including that the statement "is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts" and that the "general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence." FED. R. EVID. 807. This is of particularly import in light of the detailed testimony provided by Lockett at trial. Simply, CN-IC has failed to demonstrate that the proffered evidence is "more probative" than the evidence and testimony properly presented at trial. *See United States v. Laster*, 258 F.3d 525, 530 (6th Cir. 2001).  The residual hearsay exception therefore is of no recourse to CN-IC.

Having considered and rejected CN-IC's assertions that the district court properly admitted Lockett's prior statements into evidence pursuant to Rule 612 and various exceptions to the hearsay rule, we turn to the argument advanced for the first time on appeal that CN-IC "did ***not*** introduce the statements with the intention of proving that Johnathan Rush was actually running alongside the train when he was injured, the [d]efense merely offered the statements to impeach the testimony of . . . Lockett." *See* (Final Br. of Appellee at 28).  It is well-settled that where the contents of the writing used to refresh a witness's memory include prior statements of that witness that are inconsistent with the witness's present testimony, the prior statement may be introduced to impeach the witness. *See Shoupe*, 548 F.2d at 642-43; 4 WEINSTEIN'S FEDERAL EVIDENCE § 612.04[5] ("If the witness continues to lack memory of the matter, or to insist on a different version of the matter, the party may wish to use the prior statement as impeachment.").  Here, CN-IC purportedly sought to impeach Lockett's direct testimony that he never saw "anybody running to get on the back of the train," (Tr., Vol I. at 45), with his post-accident statement that "Johnathan was running alongside the train trying to get on," (Tr., Vol. I at 53).  Rule 613 of the Federal Rules of Evidence authorizes the impeachment of a witness by use of a prior inconsistent statement. *See* FED. R. EVID 613(a).  Indeed, our review of the record reveals that notwithstanding CN-IC's present invocations of Rule 612 and multiple hearsay exceptions, defense counsel attempted to use Lockett's prior statement for impeachment purposes.   While improper under Rule 612, defense counsel's question which incorporated the prior statement is a traditional means of confronting a witness with a prior inconsistent statement. The district court's instruction to "confront the witness with the transcript," (Tr., Vol. I at 49), indicates that the district court perceived defense counsel's cross-examination as targeting inconsistencies between Lockett's prior statement and testimony at trial.   Although unnecessary under the current version of Rule 613, defense counsel took the additional step of revealing the prior inconsistent statement to Lockett during cross-examination and afforded Lockett with the opportunity to explain the apparent inconsistency. *See* (Tr., Vol. I at 55); *see also United*

*States v. McCall*, 85 F.3d 1193, 1197 (6th Cir. 1996) (quoting the advisory committee's note to Rule 613 which provides, in pertinent part: "The traditional insistence that the attention of the witness be directed to the statement on cross-examination is relaxed").

The issue is whether the jury considered Lockett's prior, out-of-court statements introduced properly for impeachment purposes or mistakenly as substantive evidence of the circumstances surrounding Rush's accident. Rule 105 of the Federal Rules of Evidence provides: "When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly." FED. R. EVID. 105. The text of the Rule "does not clearly require the trial court to give the instruction at the same time the jury is exposed to the evidence." *See United States v. Chance*, 306 F.3d 356, 388 (6th Cir. 2003). "[T]he phrase 'is admitted' may reasonably be interpreted to require simply that the trial court give the requested instruction during final instructions." *Chance*, 306 F.3d at 388 (citation omitted).

It is undisputed that the plaintiff-appellant did not request a limiting instruction at the time Lockett's prior inconsistent statement was introduced into evidence. It is further undisputed that the plaintiff-appellant did not object to the jury's final instructions. The plaintiff-appellant likewise does not challenge the jury instructions on appeal.

As the plaintiff-appellant failed to request a limiting instruction, we review the matter for plain error. *See Chonich v. Wayne County Community College*, 973 F.2d 1271, 1275 (6th Cir. 1992); FED. R. CIV. P. 51(d)(2). It is plain error for the court not to give an instruction limiting consideration by the jury of an out-of-court statement for impeachment purposes. *See United States v. Lester*, 491 F.2d 680 (6th Cir. 1974); *United States v. Dye*, 508 F.2d 1226 (6th Cir. 1974); *United States v. Barnes*, 319 F.2d 290 (6th Cir. 1963). "[T]he danger against which such an instruction is meant to guard is that the jurors will use prior statements introduced solely to impeach a declarant as substantive evidence." *United States v. Kohrs*, 709 F.2d 1510 (6th Cir. 1983).

While the plaintiff-appellant suggested during oral argument that the district court did not provide the jury with a limiting instruction regarding Lockett's prior inconsistent statements, our review of the limited record provided by the parties indicates that the jury received the following charge during their final instructions: "You must consider . . . whether the witness testified inconsistently while on the witness stand, or if the witness said or did something or failed to say or do something at any time that is inconsistent with what the witness said while testifying." *See* ("Jury Instructions", filed with the United States Court of Appeals for the Sixth Circuit on March 18, 2004). Having the benefit of hindsight and defense counsel's explanations as to the rationale underlying his introduction of the evidence, we are of the view that the district court should have provided an instruction to the jury at the time Lockett's statements were introduced into evidence which limited the evidence to impeachment and cautioned the jury against considering the evidence as an account of the manner in which Rush fell from the train. We further find that the district court should have provided a final instruction that expressly identified Lockett's inconsistent statements and indicated that they were to be considered for impeachment purposes only.[17] Nonetheless, we do not conclude that it was plain error as the district court did provide the jury with a general credibility instruction which addressed prior inconsistencies in a witness's statements. The instruction correctly stated the applicable law, albeit without any specific reference to Lockett's statements. As we are compelled to find that jurors follow their instructions, *see Penry v. Johnson*, 532 U.S. 782, 799 (2001), we conclude that the final instructions provided to the jury directed them to consider Lockett's prior inconsistent statements solely for impeachment purposes and thereby reject the plaintiff-appellant's

---

[17] *See* Sixth Circuit Pattern Jury Instructions § 7.04.

assertion that the jury impermissibly considered Lockett's statements as substantive evidence of the accident. Therefore, no evidentiary error occurred during Lockett's testimony.

### 2.        Whether it was evidentiary error to admit into evidence the audio-tapes of the post-accident interviews

The plaintiff-appellant asserts that the district court committed evidentiary error by admitting into evidence the audio-tapes of the post-accident interviews. Following an evidentiary hearing, the district court determined that the audio-tapes were admissible extrinsic evidence of the witnesses' prior inconsistent statements.

Rule 613(b) provides that the impeaching party may produce "extrinsic evidence of a prior inconsistent statement" if "the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon . . . ." FED. R. EVID. 613(b). The foundational prerequisites of Rule 613(b) require only that the witness be given an opportunity, at some point, to explain or deny the prior inconsistent statement and that the opposing party be given the opportunity to examine the statement. *See* FED. R. EVID. 613(b); *United States v. Foster*, 376 F.3d 577, 591-92 (6th Cir. 2004).

The plaintiff-appellant contends that the district court erroneously admitted the audio-tapes into evidence because CN-IC failed to establish an evidentiary foundation. The plaintiff-appellant further contends that CN-IC failed to properly authenticate the audio-recordings.

Addressing the matter of authentication, Rule 901(a) provides that "authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." FED. R. EVID. 901(a). The rule also states, by way of illustration, that the testimony of a witness that the item is what it purports to be is sufficient authentication under the rule. *See* FED. R. EVID. 901(b)(1). Furthermore, identification of a voice over a telephone can be authenticated "by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." FED. R. EVID. 901(b)(5). Requisite familiarity can be "acquired either before or after the particular speaking which is the subject of the identification." FED. R. EVID. 901, advisory committee's notes.

CN-IC properly authenticated the audio-tapes. Martin provided extensive testimony regarding the time and manner in which he recorded the post accident statements. *See* (Tr., Vol. I at 490- 498). While the plaintiff-appellant relies heavily on testimony that Martin could not identify the voices on the tape without using the transcript, a review of the audio-recording reveals that Lockett and Moore each identified themselves by name prior to recounting their versions of the accidents. Moreover, our comparison of the interview transcript prepared by Martin to the audio-recordings reveals an accurate transcription which identifies Moore and Lockett as the speakers. Accordingly, we find that the district court properly concluded that the audio-tapes were authentic.

We similarly dismiss the plaintiff-appellant's assertion that CN-IC did not establish a proper foundation for introducing the audio-tape of Moore's statements. The plaintiff-appellant contends that CN-IC failed to confront Moore with the purported inconsistent statements during cross-examination. We addressed a similar argument in *McCall*, 85 F.3d 1193, noting that while it was advisable for the impeaching party to confront the witness with the purported inconsistency during cross-examination, a sufficient opportunity to explain or deny under Rule 613 existed where the impeached witness could be called on rebuttal. *Id.* at 1197. The district court adopted this view in addressing the plaintiff-appellant's objection:

> Well, obviously when your in the trial you can put on your proof and he can put on his proof, you will get the opportunity to do rebuttal even if I let the tape in and

somebody can explain something, you can do that on rebuttal, so that's not the big issue.

(Tr., Vol. I at 348.)  As the plaintiff-appellant has failed to advance any argument as to whether Moore was unavailable for recall as a rebuttal witness, we conclude that her claims challenging the audio-tapes of Moore's post-accident statements are without merit.

We reach a separate conclusion with regard to the introduction of the audio-taped post-accident statements of Lockett.  We long have held that when a witness admits to making a prior inconsistent statement, extrinsic proof of the statement is inadmissible.  *Dilley v. Chesapeake & Ohio Ry. Co.*, 327 F.2d 249, 251 (6th Cir. 1964); *see also United States v. Greer*, 806 F.2d 556, 559 (5th Cir.1986) (holding taped statement in direct conflict with trial testimony excludable where on cross-examination witness admitted making statement); *United States v. Sisto*, 534 F.2d 616, 622 (5th Cir. 1976) (holding that proof of prior inconsistent statement may be elicited by extrinsic evidence only if witness on cross examination denies making it).  As discussed *supra*, Lockett admitted that the interview transcript of the audio-recordings accurately reflected his prior statements.  *See* (Tr., Vol. I at 52).  Consequently, extrinsic evidence of Lockett's prior statements was unnecessary.

Moreover, Lockett's earlier reading of the prior statements to the jury causes greater concern.  Rule 613(b) address only when extrinsic proof of a prior inconsistent statement is inadmissible; it says nothing about the admissibility of such evidence.  A district court may exercise its discretion to exclude such evidence when its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  *See* FED. R. EVID. 403.  CN-IC impeached Lockett's testimony with prior inconsistent statements during cross-examination.  Lockett read these prior inconsistent statements to the jury.  We find that it was evidentiary error to admit extrinsic and cumulative evidence of Lockett's prior inconsistent statements under such circumstances.

### 3. Whether the erroneous admission of Lockett's audio-taped statements affected substantial rights

Having found evidentiary error at trial, we must address whether the district court's admission of Lockett's audio-taped statements affected the substantial rights of the plaintiff-appellant.  *See Beck*, 377 F.3d at 635-36.  We conclude that it does not.

The gravamen of the plaintiff-appellant's claims was that the CN-IC switching crew exhibited negligence in the operation of the train.  CN-IC responded with various defenses – chiefly, that Rush was a trespasser.  The threshold question for the jury therefore was whether the CN-IC switching crew used ordinary care in the operation of the train.  *See Chattanooga Station Co. v. Harper*, 199 S.W.394 (Tenn. 1917).

Notwithstanding the various and conflicting accounts of the accident, the evidence addressing CN-IC's alleged negligence was relatively straightforward.  Before the jury was the testimony of all three members of the switching crew.  The three members each testified that it was their custom and practice to sound the horn and bells prior to commencing any movement of the train.  However, no member of the switching crew could recall if the bells and horn sounded prior to Rush's accident.  Two members of the switching crew – White and Knight – did not remember seeing children near or around the train on the date of the accident, while the train's conductor – Giannini – recalled seeing two young men standing approximately fifteen feet away from the railroad tracks, *see* (Tr., Vol. II at 45).  Moore and Lockett each testified that they played near the train while Rush and two other young men climbed alongside the stopped railcar.  Rush similarly

testified that he climbed on the train's side ladder while the train was stopped. All three young men testified that they did not hear any bells or horn prior to the train commencing movement. An expert witness, Scott, reviewed this testimony and opined that the switching crew breached the ordinary standard of care by failing to stop the train upon the appearance of children near the track. Scott further testified that there lacked any evidence that the switching crew actually sounded the horn and sounded the bells.

In light of the foregoing evidence, there lacks any indication that the erroneous admission of Lockett's audio-taped statements would substantially affect the jury's determination of negligence on the part of CN-IC switching crew. CN-IC had impeached Lockett's testimony during cross-examination. The danger in admitting further cumulative and extrinsic evidence of Lockett's prior inconsistent statement was that the jury would give undue weight to the testimony or consider the prior inconsistent statement as substantive evidence. However, the inconsistency established through the audio-tape as to whether Lockett was running alongside the train or climbing on the side ladder at the time of the accident is irrelevant to the issue of whether the CN-IC switching crew acted in a negligent manner. Indeed, under each account, Rush's person was on the side of the train (either on a ladder or on foot) prior to the accident. The issue of whether Rush was running alongside the train tends to address the issue of comparative negligence – an issue the jury did not have the opportunity to address in light of their finding of no negligence on the part of CN-IC. Specifically, the jury signed and returned a verdict form which read: "Do you find the Defendant to be at fault?" *See* (J.A., 183). The jury responded: "No." *See* (J.A., 183). As a result, the jury addressed the questions posed on the Verdict Form pertaining to the plaintiff-appellant's fault.

Accordingly, we conclude that while it was evidentiary error for the district court to admit into evidence the audio-recordings of Lockett's prior statements, the error did not affect the substantial rights of the parties. Therefore, the district court did not abuse its discretion.

### B.      Negligence Per Se

The plaintiff-appellant's second assertion on appeal is that CN-IC violated Tennessee's "Lookout Statute," TENN. CODE ANN. § 65-12-108, and thereby committed negligence per se. The plaintiff-appellant advances two specific assertions: (1) the district court erred by not finding negligence per se as a matter of law; and (2) that the jury erred in failing find CN-IC negligent per se.

Tennessee law provides:

> Every railroad company shall keep the engineer, fireman, or some other person upon the locomotive, always upon the lookout ahead; and when any person, animal, or other obstruction appears upon the road, the alarm whistle shall be sounded, the brakes put down, and every possible means employed to stop the train and prevent an accident . . . .

TENN. CODE ANN. § 65-12-108(3). Further,

> A violation of any provision of § 65-12-108 by any railroad company constitutes negligence per se and in the trial of any causes involving § 65-12-108, the burden of proof, the issue of proximate cause, and the issue of contributory negligence shall be tried and be applied in the same manner and with the same effect as in the trial of other negligence actions under the common law of Tennessee.

TENN. CODE. ANN. § 65-12-109.

As an initial matter, we observe that the plaintiff-appellant did not request the district court to find as a matter of law that CN-IC violated the foregoing statute. This Court "has repeatedly held that it will not consider arguments raised for the first time on appeal unless our failure to consider the issue will result in a plain miscarriage of justice." *United States v. Ninety-Three (93) Firearms*, 330 F.3d 414, 424 (6th Cir. 2003) (quotation marks omitted).

It is CN-IC that asserts that a plain miscarriage of justice will occur should we apply the statute to facts presented in the case *sub judice*. CN-IC advances the broad assertion that Tennessee's Lookout Statute does not apply to switching operations. *See* (Final Br. of Appellee at 44) (citing *Chattanooga Station Co. v. Harper*, 199 S.W. 395, 397 (Tenn. 1917)). The case relied upon by CN-IC, *Harper*, 199 S.W. 395, is inapposite, as there, the switching operation was performed within the station or shipping yard. *Id.* at 397. In *Louisville & N.R.R. v. Martin*, 87 S.W. 418 (Tenn. 1905), the court applied the Lookout Statute to switching operations performed outside of a switching yard. *Id.* at 420. Indeed, the language of *Harper* appears to reach a similar conclusion, as the decision repeatedly notes that the accident happened *within the station* during a switching operation. *See Harper*, 199 S.W. at 398 ("It suffices that the special operation in question was a switching operation, *was within the limits* of the Nashville, Chattanooga, and St. Louis Railway Company, and was a customary operation, nightly, within the limits . . . .") (emphasis added); *see also Lawson v. Tenn. A & G Ry. Co.*, 159 F.2d 65 (6th Cir. 1947) (finding that "appellee was not required to observe [the Lookout Statutes] when its employees 'are engaged in the distribution of detached cars, in the "making up" of trains, and in other necessary switching, *in and upon its yards, depot grounds, and sidetracks*.'") (emphasis added). We nevertheless need not conclusively resolve this question of state law in light of the facts presented at trial.[18]

Assuming *arguendo* that the Lookout Statute may apply to the case *sub judice*, it would be necessary for the district court to resolve a myriad of factual disputes in order to hold CN-IC liable under the statute. By its very terms, the Lookout Statute applies only where any person "appears upon the road." TENN. CODE ANN. § 65-12-108(3). Tennessee law interprets appearance "upon the road" as appearing upon the track or roadbed in front of the moving train, and extends as far as there is danger of the obstruction being struck and injured by the engine or train while moving on the rails, but does not extend to the whole right of way. *See Southern Ry. Co. v. Cradic*, 301 S.W.2d 374 (Tenn. App. 1956) (citing *Gaines v. Tenn. Cent. Ry. Co.*, 135 S.W.2d 441 (1940); *Southern R.R. Co. v. Harris,* 9 Tenn. App. 589 (Tenn. App. 1929); *Louisville, N. & G. S. R. Co. v. Reidmond*, 79 Tenn. 205 Tenn. 1883); *Nashville & C. R. Co. v. Anthony*, 69 Tenn. 516 (Tenn. 1878); *Byrne v. Kansas City, Ft. S. & M. R. Co.*, 61 F. 605 (6th Cir. 1894); *Rogers v. Cincinnati, N. O. & T. P. R. Co.*, 136 F. 573 (1905); *Southern R. Co. v. Sutton*,179 F. 471 (6th Cir. 1910)). We stated more broadly in *Callway v. Christison*, 148 F.2d 303 (6th Cir. 1945), that the question was whether the potential obstruction "came within the sweep of the train." *Id.* at 305.

Giannini testified that he first saw two young men near the tracks just before the engine passed them. *See* (Tr., Vol II. at 38-39). Giannini further testified that the young men were fifteen to twenty feet from the track, on the other side of a spur track from the main line on which the train was traveling. *See* (Tr., Vol II. at 40). The plaintiff-appellant confronted Giannini with prior deposition testimony that the young men were five or six feet away from the track. *See* (Tr., Vol II. at 40-41). Giannini responded that he must have been talking about their distance from the spur track. *See* (Tr., Vol II. at 41-42). He also testified that they were "standing at the side, far enough away that they didn't pose a hazard to us." *See* (Tr., Vol II. at 45). In light of this conflicting evidence, we cannot say that it was a "plain miscarriage of justice" for the question of whether the

---

[18]CN-IC also advances the legal assertion that "the lookout statute does **not** apply when trespassers are involved." (Final Br. of Appellee's at 44.) However, the two cases relied upon by CN-IC as support for this assertion, *Tennessee Central Ry. Co. v. Dial*, 65 S.W.2d 610, (Tenn Ct. App. 1933) and *Louisville & Nashville Railroad Co. v. McKenna*, 75 Tenn. 313 (Tenn. 1881), do not address the application of the Lookout Statute in the context of trespassers.

young men were "upon the road" to be decided by the jury. We therefore decline to address whether the district court erred by not finding as a matter of law that the CN-IC was negligent per se.

We further conclude that the jury was not required to find CN-IC negligent per se. The foregoing evidence demonstrates that it was reasonable for the jury to conclude that the young men were at a sufficient distance away from the train that they were not "upon the road" and thus that the statute's further requirements were not applicable. Moreover, there was sufficient conflicting evidence in the record for the jury to conclude that the young men were not even near the train as evidenced by the testimony of White and Knight. Thus, we find no merit in the plaintiff-appellant's assertion that the jury erred by failing to find CN-IC negligent per se.

### C.     Presumption that Minor Incapable of Negligence

The plaintiff-appellant contends that the jury verdict is inconsistent with Tennessee law establishing a rebuttable presumption that a child between the ages of seven and fourteen is incapable of negligence. *See Caldwell v. Bechtol*, 724 S.W.2d 739 (Tenn. 1987). This presumption is rebuttable upon proof of capacity, usually by evidence of the maturity of the child. *Id.* at 749. Rush, who turned nine years old two days before the accident, falls under this presumption. The issue was relevant at trial because Tennessee is a comparative negligence state.

However, as discussed *supra*, the jury did not address the issue of comparative negligence in light of their finding no liability on the part of CN-IC.[19] Therefore, we readily reject the plaintiff-appellant's third argument on appeal.

### D.     The Motion for New Trial

In a diversity case such as this one, federal law governs the district court's decision whether to grant a new trial or to alter or amend the judgment under FED. R. CIV. P. 59. *See Conte v. General Housewares Corp.*, 215 F.3d 628, 637 (6th Cir. 2000). We review the district court's decision to deny a motion for new trial for an abuse of discretion. *See Sallier v. Brooks*, 343 F.3d 868, 880 (6th Cir. 2003). We "may grant a new trial under Rule 59 if the verdict is against the weight of the evidence, if the damages award is excessive, or if the trial was influenced by prejudice or bias, or otherwise unfair to the moving party." *Conte*, 215 F.3d at 637. However, the "jury's verdict should be accepted if it is one which could reasonably have been reached." *Id.*

The plaintiff-appellant asserts that the jury's verdict was against the clear weight of the evidence and advances several of the arguments that we have considered and rejected in our foregoing analysis. The plaintiff-appellant further asserts that CN-IC was negligent at common law for failing to stop the train when the conductor saw two young men near the train, and that the jury's verdict to the contrary was against the clear weight of the evidence. According to Plaintiff:

> An ordinary and reasonable person would never allow a train to start to move or continue to move when two children from the age of eight to eleven are at a maximum of twenty feet from the tracks and a minimum of five feet from the tracks in a highly industrial error. The safe thing and the only option was to stop the train and remove the children.

---

[19]In her reply brief, the plaintiff-appellant appears to argue that the jury form reveals an error in that it "is incomplete and invalid on it's [sic] face because the jury left part of the required jury verdict form incomplete." (Reply Br. of Appellant at 9.) This is a new argument presented in the reply brief, and not a response to any argument by advanced by the defendant, and thus we need not consider it. *See United States v. Campbell*, 279 F.3d 392, 401 (6th Cir. 2002) (quoting *United States v. Crozier*, 259 F.3d 503, 517 (6th Cir. 2001)). In any event, the argument misrepresents the record.

(Appellant's Final Br. at 47). However, in light of the conflicting testimony of Giannini, White, and Knight, reasonable minds could differ as to whether the two young men actually were present on or near the track. Assuming the jury resolved this issue in the plaintiff-appellant's favor, Giannini's testimony regarding the distance the two young men were from the track could lead reasonable minds as to the standard of care that a reasonable person would employ. Quite simply, this was a factually driven negligence case in which a significant number of the material facts were in dispute. Upon our review of the entirety of the proceedings, we conclude that the jury verdict was not against the clear weight of the evidence.

## IV.

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.