**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Donald SCHROCK, Defendant–Appellant.**

No. 87–1495.

United States Court of Appeals, Sixth Circuit.

Submitted March 24, 1988.

Decided Aug. 24, 1988.

Philip R. Sturtz, Saginaw, Mich. (court-appointed), for defendant-appellant.

Michael J. Hluchaniuk, Asst. U.S. Atty., Bay City, Mich., for plaintiff-appellee.

Before MILBURN and BOGGS, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

CELEBREZZE, Senior Circuit Judge.

Defendant Donald Schrock appeals his jury conviction for conspiring to possess with intent to distribute and to distribute methamphetamine, a Schedule II controlled substance. *See* 21 U.S.C. §§ 846, 841(a)(1) (1982). Schrock contends on appeal that he was improperly indicted and convicted for conspiring to distribute a Schedule II controlled substance because 21 U.S.C. § 812(c) lists noninjectable methamphetamine under Schedule III, and that the district court erred in admitting into evidence testimony of allegedly illicit transactions of "speed" without scientific proof that those transactions involved methamphetamine as charged in the indictment. We conclude that Schrock was properly charged with conspiracy to distribute a Schedule II controlled substance, and that the district court did not err in admitting the challenged testimony. Accordingly, we affirm.

## I.

Defendant Schrock hailed from Saginaw, Michigan, but at the times relevant to this case he resided in San Diego, California. In late April of 1985, Schrock drove from San Diego to Saginaw with Harry Cantos, who was Schrock's housemate. During the trip they experienced mechanical problems with Cantos' automobile, so upon arriving in Saginaw, Schrock telephoned Jerome Faughnan who Schrock knew as an experienced mechanic. According to Faughnan's testimony at trial, he initially declined to help, complaining that he was too tired. Schrock told Faughnan, however, that Cantos "would probably wake [Faughnan] up." Faughnan proceeded to the hotel where Schrock and Cantos were staying, and was

introduced to Cantos by Schrock. Cantos laid out a "line" of white powder and described it as "speed." Faughnan ingested the line of white powder by inhaling it through his nose.

Faughnan testified to a long history of taking speed. He had had a prescription for ten years for a drug he identified as "Prelude," [1] a synthetic amphetamine. Faughnan stated that when he could obtain it, he took dosages of the prescription in excess of the recommended amounts. Although Faughnan would not characterize himself as a "speed freak," he did directly admit that, "without a doubt," he was dependent upon speed and would use it whenever he could.

Faughnan testified that the speed he sampled at the hotel produced a reaction similar to the reaction induced by his prescription drug: "Increased my metabolism, woke me up and gave me ambition." [2] Faughnan was additionally surprised by the speed's quality; he told Cantos that, except for his prescription, he had never used such good speed. Cantos asked Faughnan if he thought there would be a market for the speed in Saginaw, and Faughnan replied, "definitely, I'd buy some." Cantos had brought only a small quantity with him, however, so none was immediately available. Schrock and Cantos soon went back to California.

Schrock returned to Saginaw in late June or early July of 1985, this time without Cantos. During the two weeks Schrock was in Saginaw, Faughnan bought two quarter ounces of speed from Schrock at $250 each. The drug was in a white-powder form that appeared similar to the speed Faughnan had sampled at the hotel in April, and each quarter ounce was packaged in a plastic bag. Faughnan testified that this speed produced effects similar to

---

1. Faughnan probably meant "Preludin." *See* Physicians' Desk Reference 684 (37th ed. 1983).

2. This description is consistent with the description of the effects of methamphetamine given by the government's expert witness, Robert Kreft, a forensic chemist with the United States Department of Justice, Drug Enforcement Administration: "Methamphetamine is a controlled substance, it's a stimulant, a central nervous system stimulant. It's sort of like a super caffeine and has an extreme stimulating effect on the body so it would be like drinking 20 cups of coffee."

those he had experienced upon sampling Cantos' speed at the hotel.

Although Faughnan purchased the speed primarily for his own consumption, he sold some of it to an acquaintance of his, John Reide, who was then president of a local motorcycle club, the Devil's Disciples. Reide wished to arrange for a steady supply of the speed, and Faughnan introduced Reide to Schrock to discuss this possibility. Reide, who also testified at Schrock's trial, stated that he attempted to raise the issue with Schrock at this meeting, but that Schrock refused to discuss it. No more speed was exchanged, and Schrock eventually returned to San Diego.

Schrock travelled to Saginaw for the third time around Labor Day, 1985. During Schrock's stay, Faughnan purchased two or three quarter ounces of speed for $250 per quarter ounce. Each quarter ounce was in the familiar white-powder form and was packaged in a plastic bag. Faughnan also arranged a second meeting between Schrock and Reide. Reide testified that once again Schrock would not discuss the possibility of Reide purchasing speed directly from Schrock. They did discuss, however, the possibility of Schrock buying a motorcycle from Reide, and they later agreed on a purchase price of $2,500 for a Harley–Davidson motorcycle. Instead of paying with cash, however, Schrock paid Reide with two and one-half ounces of "amphetamines," which were in white-powder form and packaged in plastic bags. Reide sold a portion of the speed and consumed the remainder. He testified that he had used illegal speed on prior occasions, and that the substance received from Schrock produced similar stimulating effects.

In the middle of September, Schrock left Saginaw for San Diego, but this time he was accompanied by Faughnan. According to Faughnan, he and Schrock "[w]orked on bikes, worked on cars, rode around, seen San Diego, did some speed, drank a lot of beer." Most of the speed was supplied by Schrock at no cost to Faughnan, but Faughnan did purchase a final quarter ounce of speed from Schrock during his stay. Faughnan returned to Saginaw in early October.

In late November, 1985, Faughnan made another trip to San Diego in search of more speed. Schrock did not have any speed, however, and did not expect to obtain any. Faughnan inquired how to make the speed, but Schrock repeatedly told Faughnan that he did not know. Schrock informed Faughnan, however, that two weeks earlier a San Diego newspaper had run an article that described how to make methamphetamine. Faughnan then acquired the article through independent efforts. Before returning to Michigan, Faughnan additionally traded his motorcycle to Schrock. In exchange, Faughnan received several hundred dollars and a brown vial partially filled with an oil-like substance that Schrock identified as "dirty methamphetamine." Schrock gave Faughnan some vague directions on how to clean the substance and told him that one ounce of speed might be derived from it. Faughnan left California and returned to Saginaw in early December.

Faughnan tried unsuccessfully to extract methamphetamine from the vial he had received from Schrock. On December 18, 1985, while Faughnan was conducting an experiment with the substance in the vial, federal and state authorities executed a search warrant on his house. Faughnan was arrested and many articles were seized from his house, including the vial he had received from Schrock, the article from the San Diego newspaper, and various chemicals and other paraphernalia associated with manufacturing methamphetamine.

A federal grand jury subsequently indicted Schrock and Faughnan in a three-count indictment. Faughnan, who was named in all three counts, pleaded guilty to one count and was sentenced to six months in prison and three years of probation. Schrock was named only in Count I, which alleged that between July and December of 1985, Schrock and Faughnan conspired "to possess with intent to distribute and to distribute various quantities of methamphetamine, a Schedule II Non-narcotic Con-

trolled Substance." [3] Schrock pleaded not guilty, but after a trial he was convicted by a jury. The district court entered judgment on the jury's verdict and sentenced Schrock to three years in prison. This timely appeal ensued.

## II.

Schrock first contends that his conviction is infirm because the government improperly indicted him for conspiring to distribute a Schedule II controlled substance. Under the statutory schedules enacted by Congress, methamphetamine is classified under Schedule II only when it is in an "injectable liquid" state. *See* 21 U.S.C. § 812(c) (Schedule II)(c) (1982). The evidence adduced at Schrock's trial, however, does not suggest that he was involved in the distribution of injectable liquid methamphetamine. Under the statutory schedules, Schrock argues, the evidence supports only the charge that he conspired to distribute a Schedule III controlled substance, which Congress defined in part as "[a]ny

substance (except an injectable liquid) which contains any quantity of methamphetamine." *Id.* § 812(c) (Schedule III)(a)(3). We reject Schrock's contention, however, because we find that the initial schedules enacted by Congress are no longer in effect.

In enacting the statutory classifications of controlled substances, Congress expressly provided that its initial designation of the schedules would remain in effect "unless and until amended pursuant to section 811 of this title." *Id.* § 812(c). Under section 811, Congress vested the Attorney General with the authority to add drugs to, remove drugs from, or transfer drugs between the five schedules.[4] The Attorney General may thus alter the statutory schedules, so long as the change is effected in conformity with the rulemaking procedures of the Administrative Procedure Act, 5 U.S.C. §§ 551–559, and in accordance with the factual findings required under section 812(b).[5]

---

3. In addition to the language quoted in the text, Count I of the indictment originally alleged that Schrock and Faughnan conspired to manufacture and to possess methamphetamine. Prior to trial, however, the district court granted the government's motion to strike the allegation of a conspiracy to possess. At the close of the government's proof, the court likewise granted defense counsel's motion under Rule 29, Fed.R. Crim.P., to dismiss the allegation of a conspiracy to manufacture as not supported by the evidence. Neither of these decisions is challenged on appeal.

4. Section 811(a) in part provides:

The Attorney General shall apply the provisions of this subchapter to the controlled substances listed in the schedules established by section 812 of this title and to any other drug or other substance added to such schedules under this subchapter. Except as provided in subsections (d) and (e) of this section, the Attorney General may by rule—
(1) add to such a schedule or transfer between such schedules any drug or other substance if he—
(A) finds that such drug or other substance has a potential for abuse, and
(B) makes with respect to such drug or other substance the findings prescribed by subsection (b) of section 812 of this title for the schedule in which such drug is to be placed; or
(2) remove any drug or other substance from the schedules if he finds that the drug or

other substance does not meet the requirements for inclusion in any schedule.
Rules of the Attorney General under this subsection shall be made on the record after opportunity for a hearing pursuant to the rulemaking procedures prescribed by subchapter II of chapter 5 of Title 5.
21 U.S.C. § 811(a) (1982).

5. Under section 811(a)(1)(B), the Attorney General must make the factual findings prescribed in section 812(b) before adding a drug to a specific schedule or transferring a controlled substance between schedules. For example, the findings required for Schedules II and III are:
(2) Schedule II.—
(A) The drug or other substance has a high potential for abuse.
(B) The drug or other substance has a currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions.
(C) Abuse of the drug or other substance may lead to severe psychological or physical dependence.
(3) Schedule III.—
(A) The drug or other substance has a potential for abuse less than the drugs or other substances in schedules I and II.
(B) The drug or other substance has a currently accepted medical use in treatment in the United States.
(C) Abuse of the drug or other substance may lead to moderate or low physical dependence or high psychological dependence.

Pursuant to the authority granted by Congress in section 811, and in conformity with the procedural requirements, the Attorney General in 1974 redesignated noninjectable methamphetamine as a Schedule II controlled substance:

> Unless specifically excepted or unless listed in another schedule, any material, compound, mixture or preparation which contains *any quantity of* ... *Methamphetamine*, its salts, isomers, and salts of its isomers [is a Schedule II controlled substance].

21 C.F.R. § 1308.12(d)(2) (1987) (emphasis added). Under the Attorney General's regulations, which are currently in effect, therefore, Schrock was properly indicted for conspiring to distribute a Schedule II controlled substance.

To defeat this seemingly straightforward conclusion, Schrock does not argue that the scheme adopted by Congress was an unconstitutional delegation of legislative authority,[6] nor does he contend that the Attorney General's 1974 redesignation of the schedules was either substantively or procedurally deficient under section 811. Rather, Schrock asserts that the prefatory language in the regulation, *i.e.,* "unless listed in another schedule," refers to the original statutory schedules enacted by Congress in section 812(c). Because section 812(c) lists noninjectable methamphetamine under Schedule III, the argument concludes, noninjectable methamphetamine remains a Schedule III controlled substance. We disagree.

Schrock's proposed interpretation of the regulation is inconsistent with the structure of the statutory scheme and the Attorney General's subsequent action. Congress specifically empowered the Attorney General to change the statutory schedules, constrained only by the statutory definitions of the five schedules and procedural prerequisites. The Attorney General accomplished such a change, apparently transferring all forms of methamphetamine into Schedule II. Schrock's argument, however, would effectively nullify the regulation, and result in the reinstatement of the original statutory schedules that the Attorney General's regulations were meant to supersede. Schrock thus requests that we interpret the regulation to negate itself. We decline to give this self-defeating construction to the regulation. The more realistic interpretation, and the one adopted by the district court, is that the language "unless listed in another schedule" refers to the revamped schedules promulgated by the Attorney General under section 811(a), and not to the original statutory schedules. Accordingly, we reject Schrock's contention that noninjectable methamphetamine remains in Schedule III and hold that he was properly indicted for conspiring to distribute a Schedule II controlled substance.[7]

### III.

Schrock's second contention on appeal is that the district court erred in permitting Faughnan and Reide to testify, over Schrock's objection,[8] concerning their

---

21 U.S.C. § 812(b)(2) & (3) (1982).

**6.** We note, however, that several courts have found this delegation of authority to be constitutional. *See United States v. Hope,* 714 F.2d 1084 (11th Cir.1983); *United States v. Fogarty,* 692 F.2d 542 (8th Cir.1982), *cert. denied,* 460 U.S. 1040, 103 S.Ct. 1434, 75 L.Ed.2d 792 (1983); *United States v. Alexander,* 673 F.2d 287 (9th Cir.), *cert. denied,* 459 U.S. 876, 103 S.Ct. 168, 74 L.Ed.2d 139 (1982).

**7.** We also reject Schrock's suggestion that the mention of a "hearing" in section 811(a) mandates that the district court hold a hearing to decide which schedule controls. As the language of section 811 clearly shows, the hearing mentioned in the statute is "a hearing pursuant to the rulemaking procedures prescribed by" the

Administrative Procedure Act. 21 U.S.C. § 811(a).

**8.** The government argues that Schrock's objection at trial was inadequate to preserve this issue for appeal, so that this court may review only for plain error. *See* Fed.R.Evid. 103(a) & (d). Although the government correctly notes that Schrock's counsel did not explicitly base his objection at trial on Rule 403, he did challenge the witnesses' reference to "speed," as opposed to methamphetamine, and argue that permitting the testimony raised the possibility that his client would be convicted for a crime that was not charged. Under these circumstances, we believe it was "apparent from the context," Fed.R.Evid. 103(a)(1), that the defendant was challenging the testimony for insufficient identification and arguing that preclusion under Rule 403

"speed" transactions with Schrock (or Cantos). He argues that the court should have precluded the testimony under Rule 403, Fed.R.Evid., because the government failed to prove by scientific evidence that the alleged "speed" was actually methamphetamine as charged in the indictment. Without scientific identification, Schrock asserts, the jury could not conclude that methamphetamine had actually been exchanged, thus raising the possibility that he was convicted for a crime not charged in the indictment. Since the alleged conspiracy to distribute methamphetamine was premised almost entirely on the testimony concerning the unsubstantiated "speed" transactions, Schrock further contends that the erroneous admission of the testimony fatally undermined the jury's verdict, and that reversal is therefore in order.

Under Rules 401 and 402, testimony is admissible into evidence if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401; *see* Fed.R.Evid. 402. Rule 403 carves out a narrow exception to this broad rule of admissibility:

> Although relevant, the evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed.R.Evid. 403. As the permissive language in the Rule indicates, the decision to admit relevant, but potentially prejudicial, evidence is committed to the sound discretion of the trial court. *See United States v. Zipkin,* 729 F.2d 384, 389 (6th Cir.1984); *United States v. Hans,* 684 F.2d 343 (6th Cir.1982); *United States v. Brady,* 595 F.2d 359, 361 (6th Cir.), *cert. denied,* 444 U.S. 862, 100 S.Ct. 129, 62 L.Ed.2d 84 (1979). In reviewing the trial court's decision for an abuse of discretion, the appellate court must view the evidence in the light most favorable to its proponent, giving "the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." 1 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 403[03] (1982), *quoted in Zipkin,* 729 F.2d at 390. As we stated in *Zipkin,* "the draftsmen intended that the trial judge be given a very substantial discretion in 'balancing' probative value on the one hand and 'unfair prejudice' on the other, and that [the trial judge] should not be reversed simply because an appellate court believes it would have decided the matter otherwise." 729 F.2d at 390 (quoting *United States v. Long,* 574 F.2d 761, 767 (3d Cir.), *cert. denied,* 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed. 2d 657 (1978)).

Bearing in mind our deferential standard of review, we are unable to agree with Schrock that the district court abused its discretion in admitting the challenged testimony. Initially, the challenged testimony was undoubtedly probative of the ultimate question that the jury was bound to decide—whether Schrock conspired to distribute methamphetamine. By the time Faughnan and Reide testified, the prosecution had already demonstrated that "speed" is one of the common street names for methamphetamine, and that the drug is often sold illegally in a crystalline or powder form. The testimony that the witnesses purchased a white powder which Schrock and Cantos referred to as speed, therefore, was at least relevant to identifying the substance. *See* Fed.R.Evid. 401. The probative value, however, does not end there. Faughnan's initial exposure to the

---

was necessary to prevent unfair prejudice to his client's case. Accordingly, we will consider the issue on appeal.

We agree with the government, on the other hand, that Schrock failed to preserve any objection under Rule 404(b), Fed.R.Evid. Initially, the witnesses' testimony concerning "speed" transactions between July and December, 1985, did not implicate Rule 404(b) since, as discussed in the text, the testimony was probative of the allegation of the conspiracy to distribute methamphetamine during that period. As to the testimony of Faughnan concerning the April hotel meeting, however, Schrock's counsel did not object to this testimony on the ground that the "crime" occurred outside the time period charged in the indictment. Finding no plain error in the admission of this testimony, *see* Fed.R.Evid. 103(d), we reject Schrock's Rule 404(b) challenge now asserted on appeal.

speed resulted after Schrock informed him that Cantos had something that would "wake [Faughnan] up." In addition, Faughnan testified to a long history of using a prescription stimulant, and stated that upon ingesting the drugs received from Cantos and Schrock, he experienced physical sensations similar to those he associated with his prescription. Indeed, Faughnan was quite surprised by the quality of the speed, which he found more effective than any other nonprescription speed he had taken. Reide gave similar testimony concerning the effects upon ingesting the speed compared to his prior use of illegal speed. Moreover, other aspects of their testimony augment the probative value: the drugs were in a white-powder form and were packaged in plastic bags, both indicative of illicit drugs; the drugs were ingested by inhaling through the nose, which was identified as a common method of taking illicit drugs; the drugs were exorbitantly and consistently priced at $250 per quarter ounce; and finally, Schrock's refusal to discuss speed with Reide suggests the unlawfulness of dealing in it.

Giving this evidence its maximum reasonable probative force, we conclude that it is quite probative of whether Schrock was involved in the distribution of methamphetamine. The circumstances surrounding the sales—including the price, unusual packaging, method of ingesting the white powder, and Schrock's hesitancy to discuss the speed—strongly suggest that an illicit drug was being sold. Moreover, Schrock's indication that the substance would wake Faughnan up, the parties' consistent use of the term speed, and Faughnan's and Reide's testimony to their reactions upon ingesting the substance, including Faughnan's impression of the speed's quality, all point to a high quality stimulant, such as methamphetamine. *Cf. United States v. Harrell,* 737 F.2d 971, 978–79 (11th Cir. 1984), *cert. denied,* 470 U.S. 1027, 105 S.Ct. 1392, 84 L.Ed.2d 781, 469 U.S. 1164, 105 S.Ct. 923, 83 L.Ed.2d 935 (1985) (holding

that controlled substances may be identified through similar circumstantial evidence).

■ The "unfair prejudice" that Schrock cites as substantially outweighing this probative value is that the failure to identify scientifically the transacted substances left open the possibility that those transactions involved substances other than methamphetamine (*e.g.,* cocaine or amphetamine), and therefore, that the jury could have based its guilty verdict on crimes not charged in the indictment. We cannot agree, however, that the failure to identify scientifically the transacted substances constituted "unfair prejudice" as that term is used in Rule 403.

■ Illegal drugs will often be unavailable for scientific analysis because their nature is to be consumed. As a practical matter, therefore, the evidentiary rule urged by Schrock would insulate from prosecution a large class of unlawful acts involving illicit drugs when the government happens upon the scene too late to seize a sample of the substance. To our knowledge, no court has held that scientific identification of a substance is an absolute prerequisite to conviction for a drug-related offense, and we too are unwilling to announce such a rule. In view of the limitations that such a burden would place on prosecutors, and in accordance with general evidentiary principles, courts have held that the government may establish the identity of a drug through cumulative circumstantial evidence. *See, e.g., United States v. Osgood,* 794 F.2d 1087, 1095 (5th Cir.), *cert. denied,* 479 U.S. 994, 107 S.Ct. 596, 93 L.Ed.2d 596 (1986); *Harrell,* 737 F.2d at 978–79. So long as the government produces sufficient evidence, direct or circumstantial, from which the jury is able to identify the substance beyond a reasonable doubt, the lack of scientific evidence is not objectionable. *Cf. Osgood,* 794 F.2d at 1095; *Harrell,* 737 F.2d at 978.[9]

---

9. In *United States v. Harrell,* 737 F.2d 971 (11th Cir.1984), the Eleventh Circuit concluded: "Identification of a controlled substance does not require direct evidence if available circum-

stantial evidence establishes its identity beyond a reasonable doubt." *Id.* at 978. Although this statement was made in response to an analogous evidentiary objection, we do not interpret

Practical considerations, however, are not the sole impediment to Schrock's argument. More fundamentally, his contention misconstrues the operation of Rule 403. In essence, Schrock contends that he was unfairly prejudiced by the testimony of Faughnan and Reide because it was insufficient to prove the identity of the transacted substance, and scientific evidence was necessary to render the evidence sufficient. Under the Rule 403 balancing process, however, probative value and unfair prejudice are distinct elements in the inquiry. *See Zipkin,* 729 F.2d at 390; Fed.R.Evid. 403. To adopt the rule that Schrock urges —that unfair prejudice can be found solely in the lack of probative value of the evidence—would distort the Rule 403 inquiry beyond recognition.[10]

In a closely related situation, courts have routinely rejected the claim that a party was unfairly prejudiced under Rule 403 because the challenged evidence was contrary to his view of the facts. *See, e.g., United States v. Mendez–Ortiz,* 810 F.2d 76, 79 (6th Cir.1986), *cert. denied,* 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 697 (1987); *United States v. Monahan,* 633 F.2d 984, 985 (1st Cir.1980); *Carter v. Hewitt,* 617 F.2d 961, 972 (3d Cir.1980). As we stated in *Mendez–Ortiz,* " 'Unfair prejudice,' as used in Rule 403, does *not* mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather, it refers to evidence which tends to suggest decision on an improper basis." *Mendez–Ortiz,* 810 F.2d at 79 (emphasis added); *see also* C. McCormick,

McCormick on Evidence § 185, at 545 (1984) ("Prejudice can arise ... from facts that arouse the jury's hostility or sympathy for one side without regard to the probative value of the evidence."). We believe that this principle applies with even more force to a situation such as this, in which a party claims prejudice due to lack of probative value: if highly probative evidence is not unfairly prejudicial to a party's case under Rule 403, it is difficult to comprehend how unfair prejudice could be found in evidence that is claimed to lack probative value, a situation which is more favorable to the objecting party. Thus, absent a showing, that the challenged evidence invites the jury to decide the case on an improper basis, unrelated to the probative value of the evidence, it is not unfairly prejudicial under Rule 403. *See Mendez–Ortiz,* 810 F.2d at 79.

Applying these considerations, we reject Schrock's challenge under Rule 403 to the admission of Faughnan's and Reide's testimony. The failure to identify the transacted substance by scientific evidence did not cause this relevant testimony to become unfairly prejudicial. As we stated above, the government is free to prove the identity of the drugs through circumstantial evidence.[11]

Although we conclude that the government's reliance on circumstantial evidence does not implicate Rule 403, we find some merit in Schrock's premise that such reliance may risk a jury verdict based on insufficient evidence. To safeguard against this possibility, however, the courts

it as incorporating the beyond-a-reasonable-doubt standard into the admissibility determination, which would certainly be a novel legal position. Rather, the Eleventh Circuit was apparently reiterating the standard for the sufficiency of the evidence to establish the identity of the controlled substance. *Cf. United States v. Osgood,* 794 F.2d 1087, 1095 (5th Cir.1986) (reviewing sufficiency of evidence to establish identity under beyond-a-reasonable-doubt standard).

10. For example, equating unfair prejudice with the lack of probative value would likely result in the exclusion of much circumstantial evidence, which by its very nature is insufficient alone to prove the fact in issue. *See* C. McCormick,

McCormick on Evidence § 185, at 542–43 (1984) (discussing difference between direct and circumstantial evidence).

11. Insofar as Schrock's argument may be understood to suggest that the district court must first find, as a matter of fact, that the transacted substance was methamphetamine before admitting testimony of the transactions, we note that a similar contention has recently been rejected by the Supreme Court in the context of an "other crimes" objection under Rule 404(b). *See Huddleston v. United States,* —— U.S. ——, 108 S.Ct. 1496, 1499–1502, 99 L.Ed.2d 771 (1988); *id.* 108 S.Ct. at 1501 n. 6 (no preliminary finding required by district court in performing the balance required under Rule 403).

do not refuse otherwise relevant evidence, as Schrock would have us do. Instead, the defendant is protected by the trial court reviewing the evidence under Rule 29, Fed. R.Crim.P., prior to submitting the case to the jury, to determine whether the government has produced sufficient evidence, direct or circumstantial, to support a jury verdict against the defendant. *See Jackson v. Virginia,* 443 U.S. 307, 317 n. 10, 99 S.Ct. 2781, 2788 n. 10, 61 L.Ed.2d 560 (1979); *United States v. Reifsteck,* 841 F.2d 701, 703 (6th Cir.1988); *United States v. Cox,* 593 F.2d 46, 48 (6th Cir.1979); *see* 2 C. Wright, Federal Practice and Procedure § 461, at 637–38 (1982) (Rule 29, "is an important safeguard for the defendant. It tests the sufficiency of the evidence against him, and avoids the risk that the jury may capriciously find him guilty though there is no legally sufficient evidence of his guilt." (footnotes omitted)).

■ This was exactly the procedure followed by the district court in this case. Although Schrock does not directly challenge the district court's Rule 29 decision, we note that the court was correct in submitting the case to the jury. As described above, the challenged testimony was probative that Schrock was selling a high quality stimulant such as methamphetamine. The stimulating effects reported by Faughnan and Reide upon ingesting the substance were also consistent with those that the government's expert associated with methamphetamine. In addition, when Faughnan inquired from Schrock the recipe for making the "speed," Schrock led him to a newspaper article discussing how to make methamphetamine. Finally, in exchange for Faughnan's motorcycle, Schrock gave Faughnan a brown vial that Schrock described as "dirty methamphetamine." The government's expert witness confirmed by scientific analysis that the substance did indeed contain methamphetamine. Under these circumstances, the evidence viewed in its entirety was sufficient to justify submitting the case to the jury. Accordingly, the district court's failure to require scientific identification of the transacted substance was not erroneous.

## IV.

For the foregoing reasons, the judgment of the district court is AFFIRMED.