**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 06a0496n.06**
**Filed: July 14, 2006**

**No. 05-1874**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| ANTHONY EASON, | ) | WESTERN DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |

Before: GILMAN, SUTTON and COOK, Circuit Judges.

SUTTON, Circuit Judge. After a five-day trial, a jury convicted Anthony Eason of two counts of conspiring to distribute and possess with intent to distribute controlled substances (cocaine, crack cocaine and marijuana) in violation of 21 U.S.C. §§ 841(a)(1) and 846 and one count of engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848. The district court sentenced him to 40 years in prison. On appeal, he claims that the statute of limitations should have barred the government from bringing the continuing-criminal-enterprise charge, that insufficient evidence supported this aspect of the jury verdict, that the district court improperly admitted several pieces of evidence and that the court unreasonably sentenced him. Finding no merit to these claims, we affirm his conviction and sentence.

I.

In 1996, a federal grand jury indicted a group of drug dealers, including Eason, for selling drugs in Benton Harbor, Michigan. By 1997, the government had arrested and convicted all of the drug dealers involved in these charges, save Eason who managed to evade arrest for the next eight years.

On July 4, 2004, authorities finally apprehended Eason after receiving a tip from his mother that he was at her house in Chicago. When the police arrested him, Eason offered false identification and claimed to be Anthony Vega.

On August 25, 2004, a federal grand jury returned a new indictment against Eason. Counts one and two of the indictment reprised the 1996 indictments, and count three charged him with operating a continuing criminal enterprise. The jury found Eason guilty on all three counts. On June 20, 2005, the district court sentenced him to 40 years in prison and 5 years of supervised release.

II.

A.

Eason contends that the government waited too long to bring the continuing-criminal-enterprise charge against him. Noting that the last transaction identified in the enterprise charge occurred in 1996 and that the government did not charge him until 2004, he argues that the charge is time barred. "Except as otherwise expressly provided by law," the relevant statute of limitations

says, "no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed." 18 U.S.C. § 3282(a). The government does not dispute that it brought the charge more than five years after the acts underlying the continuing-criminal-enterprise charge took place. But it points out that an "[e]xcept[ion]" to the limitations provision applies here because elsewhere in Title 18 it says that "[n]o statute of limitations shall extend to any person fleeing from justice." *Id*. § 3290.

To establish that Eason was a "person fleeing from justice," the government had to show that he "concealed himself with the intent to avoid prosecution." *United States v. Greever*, 134 F.3d 777, 780 (6th Cir. 1998). The government presented ample evidence to satisfy this requirement. It established that Eason frequently used aliases to "conceal[]" his true identity. *See* JA 144 (Eason was "adept at avoiding detection" because he "has a very solid history of using alias names. He's been arrested by the Chicago Police numerous times using at least eight different names that don't appear to be related to each other, names that are totally different; for example, Antonio Vega, Andrew Brown, names like that."); JA 148 ("[S]ome of the names that he was arrested under" were "Andrew Brown; Anthony S. Eason; Anthony Eason; Anthony Easton . . . ; Michael Q. Jeffries; Charles Johnson; Carl Herrington; Carlos Jordan; [and] George Thomas . . . ."); JA 145 (When he was arrested at his mother's house on July 4, 2004, he produced "an Illinois driver's license with [his] picture in the name of Antonio Vega . . . .").

Because intent to avoid prosecution "can be inferred from the defendant's knowledge that he was wanted and his subsequent failure to submit to an arrest," *Greever*, 134 F.3d at 780, the government also showed that Eason knew a warrant was out for his arrest. *See, e.g.*, JA 140 ("[S]ometime around March of 1997," about three months after the warrant for his arrest was issued, there was a "monitored telephone conversation which was taped between a cooperating individual and Mr. Eason where that individual told Mr. Eason that he in fact was wanted."); JA 143 (In the "spring or summer of 1997," Chicago FBI agents "tried to develop a liaison with [Eason's] mother in an attempt to locate Mr. Eason, and during those conversations with his mother they clearly told his mother that he was wanted" and "his mother . . . admit[ted] that Mr. Eason was aware that he was wanted.").

In the final analysis, this charge was not time barred. Section 3290 exempts a "person fleeing from justice" from § 3282's five-year limitations period, and the evidence in this case amply supported the district court's finding that Eason was such a person.

## B.

Eason next challenges the sufficiency of the evidence supporting his conviction for operating a continuing criminal enterprise. To convict a defendant of this crime, the government must prove: "(1) a felony violation of the federal narcotics law; (2) as part of 'a continuing series of violations;' (3) 'in concert with five or more persons;' (4) for whom the defendant is an organizer or supervisor; and (5) from which he derives substantial income." *United States v. English*, 925 F.2d 154, 156 (6th

Cir. 1991) (quoting 21 U.S.C. § 848(c)). Eason argues that the government failed to prove the fourth element of the crime because it showed only that he was engaged in a series of buyer-seller relationships, not that he controlled or managed the conspiracies. *See United States v. Long*, 190 F.3d 471, 475 (6th Cir. 1999) ("[M]erely proving that the individuals had a buyer-seller relationship with the defendant is not sufficient to support a conviction for engaging in a [continuing criminal enterprise].").

The evidence presented to the jury showed that Eason did far more than buy and sell drugs with his co-conspirators. It showed that Eason controlled, gave directions to and supervised these other individuals. Maurice Isaac, for example, testified extensively that Eason mentored, trained and directed him. *See* JA 873–74 (Isaac "g[o]t involved in drugs" when "my man Frosty [one of Eason's nicknames] came along, you know what I'm saying, and, you know, driving his nice cars and stuff. So, you know, he told me, you know, man, you need to start, you know what I'm saying, getting on your feet, you know what I'm saying, so he put me on my feet. . . . [W]e always been friends, so he pulled me up . . . . He asked me do I want to, you know, get into the thing? I said yeah. Into the drug business? I said yeah."); JA 878 ("You know, at first, you know, I wasn't making no money at it, you know, so he told me, You can't sell it like that. You got to stretch it. So I got some Isotol, it's a mixture, and I start, you know, putting a mixture on it and made a little bit, you know, more of it, so that's when I started making a little bit more money."); JA 893 (Eason "taught me everything about the [drug] game."); JA 894 (Eason "coached me, you know what I'm saying? You know, he was a good dude to me, you know."); JA 895 (When "major distributors"

that Eason was "supplying" would stop by Eason's house when Eason was out of town, Eason would tell Isaac "to take care of it for him.'"); JA 896 ("So if he had somebody coming down and he won't be around, he's like, Hey, Jed, ["Jed Money" was Isaac's nickname, JA 872] I got somebody coming down, you know, like somebody like Wes[ley Moore, another co-conspirator,] came down a couple times and he left me with a couple of—you know, like nine ounces here and a half key here for him, you know."); JA 912–13 (If buyers needed "to get ahold of Frosty and they couldn't," "they come straight over to my house and I get in touch with Frosty for 'em . . . . [h]e'd call me right back if I paged him.").

Isaac also testified about a trip that Eason arranged to California to purchase seven kilograms of cocaine. Eason recruited two female co-conspirators to courier the money and drugs and coordinated the exchange. Another witness testified that Eason ordered an individual who worked for Eason (who "was pretty much [Eason's] flunky in Benton Harbor") to "teach me how to cook" powder cocaine into crack cocaine. JA 754. And a variety of other witnesses also testified to Eason's supervision of the enterprise. *See* JA 1194–95 ("Keith Curtis . . . indicat[ed] that Mr. Eason controlled the price, location and quantity. Demetrius Scales . . . said Mr. Eason was . . . 'the big man,' . . . with a . . . 'huge reputation . . . .' Wesley Moore . . . said the defendant had a reputation and visibility as . . . 'the supplier . . . .' Anthony Hill . . . indicated that Mr. Eason could get crack cocaine or rock, as he called it, in any quantity whenever he, Hill, wanted it by simply calling Mr. Eason . . . . Virece Kazee said that Mr. Eason was a major drug supplier. Columbus Franklin . . . said the defendant's reputation was for violence and he was a . . . 'big man' . . . in drug trafficking.

Ronald Edison said . . . that he paged the defendant whenever he wanted powder or crack. Willie Ross . . . indicated that while he, Willie Ross, was a substantial supplier of cocaine and crack in Benton Harbor, that th[e] main supplier to him for a period of two and a half to three years . . . was Mr. Anthony Eason; that Mr. Eason arbitrarily determined the price and the location and very deliberately determined the means of the rendevous or location for the delivery. . . . Brian Amos, who was apparently a cellmate at Newaygo County jail while awaiting sentenc[ing] in this matter, testified that Mr. Eason bragged while he was in the cell about his position as a . . . 'top dog' . . . in the drug trade."); JA 1198 (The "testimony taken in its entirety demonstrates not only participation in the drug conspiracies . . . but it also testifies to the running of the drug enterprise . . . .").

Viewing the evidence in the light most favorable to the government, as we must, *United States v. Collins*, 78 F.3d 1021, 1030 (6th Cir. 1996), numerous witnesses confirmed that Eason controlled co-conspirators, gave directions and instructions to them and made decisions about the conspiracy and its scope. Eason's challenge to the sufficiency of the evidence supporting the continuing-criminal-enterprise charge therefore must fail.

## C.

Eason next challenges the district court's admission of four pieces of evidence. The "decision to admit relevant, but potentially prejudicial, evidence is committed to the sound discretion of the trial court." *United States v. Schrock*, 855 F.2d 327, 333 (6th Cir. 1988). And "[i]n

reviewing the trial court's decision for an abuse of discretion, the appellate court must view the evidence in the light most favorable to its proponent, giving the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." *Id.* (internal quotation marks and citations omitted).

Eason argues that the court should not have permitted several witnesses to testify about threats he made to government witnesses. The court admitted evidence showing that Eason threatened the lives of the potential witnesses and their families, including their children, that he physically assaulted one witness in jail and that at trial he produced a false affidavit purportedly from one of the government's witnesses. Eason argues that this evidence was substantially prejudicial and inflammatory and that it "may be considered improper character evidence of prior bad acts." Eason Br. at 43.

Because "spoliation evidence, including evidence that the defendant threatened a witness, is generally admissible because it is probative of consciousness of guilt," *United States v. Maddox*, 944 F.2d 1223, 1230 (6th Cir. 1991), and because "threats against a witness constitute an effort by the defendant to tamper with the substance of the government's case, and thus are probative of a defendant's awareness that the government is likely to prevail at trial," *United States v. Copeland*, 321 F.3d 582, 597 (6th Cir. 2003), the court did not abuse its discretion in admitting this evidence. It is hard to imagine *any* intimidation evidence that would not be deeply prejudicial to the defendant. Indeed, the more deliberate and extreme the defendant's efforts to tilt the truth-finding process the more probative—and prejudicial—the evidence. Still, even if there may be sufficiently

prejudicial spoliation evidence that a district court could not admit without abusing its discretion, this evidence did not rise to that level. The "worst" evidence—that Eason targeted children—was presented with other evidence in a fairly generic manner that lacked graphic details that might risk shocking and unduly inflaming a jury. *See, e.g.*, JA 364 (Eason "was telling me . . . . [w]hoever testify against him, his men gonna be in court and he gonna kill their kids who testify.").

Eason next argues that the court should not have admitted evidence documenting a small amount of drugs that police seized from a co-conspirator in 1990 and that, in accordance with local government policies, was destroyed before Eason's trial. In complaining that the government could have kept the underlying drugs because they would have remained "stable" for a long time, Eason misses the point. The question is not whether the government could have kept the drugs; the question is whether it had to. The government destroyed the drugs once Eason's co-conspirator's case had ended in accordance with a county policy designed to preserve its limited space for evidence. "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). Eason has not shown governmental bad faith, and he has not shown that the evidence had exculpatory value to him. *See California v. Trombetta*, 467 U.S. 479, 488–89 (1984) (The "duty the Constitution imposes on the States to preserve evidence . . . must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant

would be unable to obtain comparable evidence by other reasonably available means.") (footnote and citation omitted).

Eason also objects on hearsay grounds to the admission of his pager number. When police arrested a co-conspirator in 1990, the individual provided them with the pager number of the person who had supplied the drugs the officers seized. Later that year, a traffic officer detained Eason and cited him for operating a vehicle without a license. The officer found a pager on Eason and determined that its number matched the one the co-conspirator had given to the police earlier. By the time of Eason's trial, no witness could remember the pager number, but the court allowed the government to let the officer read the pager number he had recorded in his report after arresting the co-conspirator.

Eason offers no answer to the government's response that the court properly admitted the pager number under the past-recollection-recorded exception to the hearsay rules. *See* Fed. R. Evid. 803(5). The introduction of the pager number satisfied the exception because the officer "(1) . . . once had knowledge about the matters in the document; (2) . . . [when called to testify at trial had] insufficient recollection to testify fully and accurately; and (3) the record was made at a time when the matter was fresh in the witness' memory and reflected the witness' knowledge correctly." *United States v. Porter*, 986 F.2d 1014, 1016–17 (6th Cir. 1993).

Eason next objects to the court's admission of a statement from the officer who detained Eason in 1990 for the traffic violation discussed above. By the time of Eason's trial, that stop had

taken place 15 years earlier. The officer testified that he remembered Eason from the stop and identified him in court. To explain how he was able to remember Eason after all that time, he said that he remembered Eason because "at the time of [the] traffic stop, [Eason] was subject to being identified as a major drug dealer in the Benton Harbor area." JA 556. Eason objected and requested a curative instruction to the jury (without specifying the grounds for his objection), but the court overruled the objection. The government noted that the statement was "not being offered for [its] truth," then rephrased the question: "[W]as it because this individual became a target of your narcotic investigations [that you are able to identify Eason today]?" *Id.*

The government's statement sufficiently clarified for the jury that it did not offer the officer's statement to prove Eason's status as a drug dealer but to explain how a traffic officer could recall an individual he had stopped a decade and a half ago. Overwhelming evidence, at any rate, established that Eason was indeed "a major drug dealer in the Benton Harbor area," and the officer's statement, even if it had been mistakenly offered for its truth, did not materially harm Eason.

D.

Eason, lastly, challenges his sentence. At Eason's sentencing hearing, the district court extensively reviewed the testimony that supported the jury's verdict and calculated Eason's criminal history level (IV) and offense level (43). The court then noted that its "calculation under these . . . guidelines is truly a guideline," and that "while it is not binding upon this Court in a *Blakely* context, it is still the starting point from which the Court measures a sentence that the court might

impose, the Court being free to establish" an appropriate sentence in exercising its independent judgment. JA 1199.

An appropriate sentence, the court added, "has to take into consideration the seriousness of this offense and has to take into consideration the protection that is due to the public. The defendant has not been particularly cooperative, so that has to be factored into this matter. The deterrence factor has to be weighed in because this is a community and this is a particular type of offense that seems to attract nefarious characters for whom the opportunity to make money and for whom the opportunity to forge relationships and conspiracies appears to be quite opportunistic and quite deleterious to the health of the communities, Benton Harbor being Exhibit A for that." JA 1212. The court ultimately sentenced Eason to 40 years in prison.

Eason complains that the court engaged in judicial fact finding in violation of *United States v. Booker*, 543 U.S. 220 (2005). But by now it is well established that *Booker* does not prohibit judicial fact finding under the guidelines in and of itself; it prohibits judicial fact finding in connection with imposing a sentence under mandatory guidelines. *See United States v. Stone*, 432 F.3d 651, 654–55 (6th Cir. 2005) ("*Booker* did not eliminate judicial fact-finding. Instead, the remedial majority gave district courts the option, after calculating the Guideline range, to sentence a defendant outside the resulting Guideline range."). As the court recognized that the guidelines were advisory, it did not violate *Booker*.

Eason also complains that the court attributed too many criminal-history points to him because it attributed two prior convictions to him instead of consolidating them. *See* U.S.S.G. § 4A1.2(a)(2) ("[P]rior sentences . . . imposed in related cases are to be treated as one sentence . . . ."). As the district court recognized, however, Eason was sentenced for the first conviction (for aggravated assault and possession of controlled substances) in 1992, which arose from conduct in 1989, and for the second conviction (for unlawful use of a firearm by a felon) in 1996, which arose from conduct in 1994. At his second sentencing, the court also sentenced Eason for a probation violation related to the first conviction. This modest and purely happenstance connection between the two convictions, however, does not make them "related" under U.S.S.G. § 4A1.1(a)–(c). *See United States v. Carter*, 283 F.3d 755, 758 (6th Cir. 2002) (Simply because a defendant was "sentenced . . . on the same day as to all three offenses with the sentences to be served concurrently" does not mean that the offenses were related where "all three offenses were separately indicted and never consolidated . . . .").

Eason also challenges the reasonableness of the length of his sentence. As an initial response, the court granted Eason a downward variance in sentencing him. The recommended guidelines range was life in prison, and the court sentenced him to a 40-year prison term. In choosing not to give Eason a greater downward variance, the court considered the § 3553(a) factors and did not improperly exercise its discretion under them. *See* JA 1212–13 ("This Court is of a mind to believe that putting a term of years into a sentence gives Mr. Eason the opportunity to work toward good time and to work toward the good works that he can do while in the prison setting

which will make him eligible at a certain point for a supervised release sentence of five years that

follows this sentence. Therefore, the good time provisions that go with a sentence of years will be

to the advantage of Mr. Eason if he chooses to advantage himself by them.").

III.

For these reasons, we affirm.