NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0292n.06

Case No. 21-2974

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Jul 19, 2022
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF MICHIGAN |
| DEMETRIO FLORES, III, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | O P I N I O N |

Before: SILER, McKEAGUE, and LARSEN, Circuit Judges.

**McKEAGUE, Circuit Judge.** Police arrested defendant Demetrio Flores III after finding him in the backseat of a car with a handgun at his feet. The government charged him with being a felon in possession of a firearm. Before and during trial, Flores challenged various evidentiary rulings made by the court, which it denied. The jury found Flores guilty. Flores appeals the court's decisions to admit DNA evidence and to exclude extrinsic impeachment evidence. He also appeals his conviction on sufficiency-of-the-evidence grounds. For the reasons set forth below, we affirm.

**I.**

*Arrest:* In the early morning of January 24, 2019, police responded to a dispatch for a warrant and pickup at a hotel in Holland, Michigan. Upon arrival, they spoke to the woman who had called in saying her husband, Jesus, had an outstanding warrant and was staying at the hotel. She said she believed that he was in a Chevy Malibu in the parking lot. As one of the officers,

Officer Schoen, approached the passenger side of the vehicle, the rear window was rolled down. Schoen testified that he could see a man, who turned out to be Demetrio Flores, "bent over near the floor, and his hands were going back and forth." R. 119, P. 1614. Schoen described these movements as "furtive gestures," and said that in his experience these gestures often indicate someone may be trying to hide something. *Id.* at 1621–22. He shined a flashlight in the car and saw a black medical glove next to a black handgun partially under the seat on the floorboard. There was ammunition in the seat pocket right in front of Flores. Schoen yelled, "gun," and drew his weapon. Flores complied with police orders and was arrested. The government later indicted Flores for being a felon in possession of a firearm.

After arresting Flores, police questioned one of the other passengers in the vehicle, Victoria Ortiz. She told officers that she did not know that a gun was in the car.

At the scene, Officer Dozeman collected evidence from the car. First, he collected Flores's cell phone, then the gun and ammunition. He used the same rubber gloves to collect all the evidence, as was his typical practice in 2019. His process has since changed, to avoid cross-contamination.

*Pretrial:* The Michigan State Police lab tested the gun and found a mixture of DNA from three people on it. At trial, a government expert testified that it was "1.2 octillion times more likely that th[e] DNA profile was developed from Mr. Flores and two unknown contributors rather than . . . from three unknown donors." R. 120, P. 1782. The expert considered this "very strong support that Mr. Flores was contributing to that [DNA] mixture." *Id.* at 1783. She acknowledged that testing could not tell how the DNA came to be on an object, and that it is possible it could have gotten there via DNA transference. DNA transference occurs when DNA is put on an object

by indirect transfer rather than directly touching the object. For example, sneezing, coughing, or touching another object that has DNA on it and then touching the object in question can result in DNA transference. She also explained that DNA is just one piece of the evidence puzzle. The defense objected to admission of the DNA evidence, citing the likelihood of transference. The court denied the motion to exclude.

Police also extracted messages from Flores's cell phone in which Flores appeared to discuss having or using a gun. In conversation with his girlfriend, Krystaa, he mentioned that her brother was mad at him because "I told him I'm not down to put no work in with him . . . . So he's pissed he doesn't know anyone else with guns." R. 120, P. 1801. On another occasion, he asked her:

> Flores: Where's my bitch.
> Krystaa: Who.
> F: My bitch.
> K: TF.
> F: Pistol.
> K: Can't tell you.
> F: Why.
> K: You told me not to.
> F: If it's here, I got to move it.
> K: Why.
> F: Because I don't want someone else to get it.
> K: No one else knows.
> F: U promise.
> K: I promise.

*Id.* at 1802–03. Later, he told his girlfriend that he accidentally "popped the gun." *Id.* at 1803. Nine days before the incident, he sent a message to a friend that said, "War . . . you c me bang bang" and "let's get it bro bang bang." *Id.* at 1806. The defense moved to exclude these messages, and the court denied the motion.

*Trial and Sentencing:* At trial, Ortiz testified about the events leading up to Flores's arrest. Contrary to her statement at the scene, she testified that she had previously seen Flores with the gun in question. Ortiz said that she was hanging out with Flores the night before the arrest. They were smoking in her car when she saw Flores in the backseat holding the handgun with a black glove on. She admitted to using methamphetamine and cocaine that night.

The defense cross-examined Ortiz about the incongruence of her statements. She said that she did not believe she had lied to the officers on the scene:

Q: When you sat down with Officer Hahn, did you know it was very important to tell her the truth?
A: I did tell her the truth. We're talking about the lady officer, correct?
Q: Yes.
A: I did tell her the truth. I didn't lie to her.
Q: You said you didn't know anything about a gun.
A: Yeah. In the car. I didn't - - she - - I answered questions that she asked, is what I did.

R.119, P. 1709. She said the same about the second officer who questioned her that morning:

Q: When you sat down with Task Force Officer Calderone, did you know that it was important to tell the truth?
A: Yes.
Q: You were aware that it would be a very serious matter if you lied, right?
A: Yes.
Q: Okay. And did you say to Task Force Officer Calderone that you knew nothing about a gun?
A: I don't believe I told him that. I believe I might have said to him, 'I don't know whose gun it was' because I didn't know. I just told him what I knew, and that's very minimal.

*Id.* at 1710. Immediately after those statements, however, Ortiz admitted that she initially told officers at the scene that she knew nothing about the gun:

Q: Okay, did you ever tell any other law enforcement personnel that you didn't know anything about a gun being in the car that night?
A: I - - I told the officer at the scene, told - - I think it was the officer at the scene and one other officer, I believe.

Q: Okay. You told them both you didn't know anything about a gun in the car.

A: Yes.

Q: Okay. The other officer, do you remember man, woman, you know, age approximately, height, weight?

A: When I talked to Detective Calderone, I told him that, and then when I talked to the officer at the scene, I told her that as well.

Q: Okay. That you didn't know anything about a gun.

A: Yeah.

*Id.* at 1710–11.

Following this exchange, defense counsel moved to admit extrinsic impeachment evidence under Rule 613(b). The defense sought subpoenas for the officers that questioned Ortiz the day of Flores's arrest, intending to elicit testimony to show that Ortiz made a prior inconsistent statement. The court denied the motion because Ortiz admitted to making the inconsistent statement during cross-examination.

At the end of the trial, Flores moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29. The court denied the motion. The jury found Flores guilty. The court sentenced him to 78 months custody, 3 years of supervised release, and a $100 fine. Flores appeals. He challenges the court's decision to admit the DNA evidence, its exclusion of the extrinsic impeachment evidence, and his conviction for sufficiency of the evidence.

**II.**

First, we address Flores's evidentiary claims. We review for abuse of discretion the district court's evidentiary rulings, reversing only "if the abuse of discretion caused more than harmless error." *Stone Surgical, LLC v. Stryker Corp.*, 858 F.3d 383, 391 (6th Cir. 2017) (citation omitted).

Flores challenges two evidentiary rulings made by the district court: the decision to admit DNA evidence found on the gun, and the decision to preclude extrinsic impeachment evidence.

He argues that the DNA evidence should have been excluded because, given recent science on the fallibility of such evidence due to potential DNA transfer, its prejudicial effect substantially outweighed its probative value. He then argues that extrinsic impeachment evidence should have been admitted because the government's witness made a prior inconsistent statement. Neither argument prevails. We address each claim in turn.

**A.**

We begin with the DNA evidence. Flores does not directly challenge the admissibility of the DNA evidence itself, as this court has recently reaffirmed the reliability of such scientific evidence. *See United States v. Gissantaner*, 990 F.3d 457, 463–67 (holding that "STRmix [DNA evidence] satisfies Rule 702 . . . [because] it is the product of reliable principles and methods"). Instead, Flores contends that the evidence should have been excluded due to its potential to unfairly prejudice the jury. He argues that the likelihood of DNA transfer in this case rendered the DNA evidence so unreliable that its prejudicial effect substantially outweighed its probative value.

Federal Rule of Evidence 403 allows courts discretion to "exclude relevant evidence if its probative value is substantially outweighed by . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." District courts have "'very broad' discretion" in balancing the probative value against these potential drawbacks. *United States v. Vance*, 871 F.2d 572, 576 (6th Cir. 1989) (quoting *United States v. Vincent*, 681 F.2d 462, 465 (6th Cir. 1982)). Our review requires that we "look at the evidence in the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *United States v. Poulsen*, 655 F.3d 492, 509 (6th Cir. 2011) (quoting *United States v. Bonds*, 12 F.3d 540, 567 (6th Cir. 1993)). With that lens, a Rule 403

violation only occurs if we are convinced that the evidence would "result in 'unfair prejudice.'" *Bonds*, 12 F.3d at 567 (quoting *United States v. Schrock*, 855 F.2d 327, 333 (6th Cir. 1988)). Such evidence must "suggest a decision on an impermissible basis," which requires more than "the damage to a defendant's case that results from the legitimate probative force of the evidence." *Id.*

This court confronted a similar Rule 403 DNA evidence issue in *Bonds*. *Id.* There, the district court admitted the government's expert testimony regarding the likelihood that defendant Bonds was a contributor to the DNA found in the car of the murder victim. *Id.* at 549. Bonds objected on several grounds, including under Rule 403. *Id.* at 567. We addressed the possibility that a jury might view DNA evidence as "infallible," but held that because the defense had ample opportunity to cross-examine and show the deficiencies of DNA evidence, the district court did not abuse its discretion in determining that the probative value outweighed any prejudice. *Id.* at 568. More broadly, we noted that exclusion is not the proper remedy for such concerns about DNA evidence. *Id.* Rather, "defendants' concern that the jury relied unduly on this circumstantial DNA evidence . . . is accommodated through a Rule 29 motion for judgment of acquittal to assure that the Government produced enough evidence, circumstantial or direct, to support a jury verdict." *Id.*

Granted, the science of DNA evidence has greatly advanced since *Bonds* was decided. But we recently confirmed that the procedures used in Flores's case are scientifically reliable. *See Gissantaner*, 990 F.3d at 467. In doing so, we reiterated that assessing the weight to give DNA evidence, considering deficiencies like the potential for DNA transference, "is what trials and juries are for." *Id.* at 470.

Here, the DNA evidence is clearly probative because it links Flores to possession of the firearm, an essential element of his conviction. Although not definitive, it is relevant circumstantial evidence of Flores's connection to the firearm. Like in *Bonds*, "[t]he aura of reliability surrounding DNA evidence does present the prospect of a decision based on the perceived infallibility of such evidence." *Bonds*, 12 F.3d at 567–68. But just like in that case, the scientific approach used here was held to be scientifically valid, *see Gissantaner*, 990 F.3d at 463–67, and the defense was given a chance to cross-examine the government witnesses to show why they believe "the results were unreliable, the procedures flawed, and the DNA evidence not infallible," *Bonds*, 12 F.3d at 568. In other words, the likelihood of DNA transfer goes to the weight, not the admissibility, of the evidence in this case. The opportunity to cross-examine and present counter evidence, as well as the availability of a Rule 29 motion, are sufficient remedies. Ultimately, "the damaging nature of the DNA evidence to defendants and the potential prejudice does not require exclusion." *Id.* Thus, the district court did not abuse its discretion by admitting the DNA evidence.

**B.**

Next, the impeachment evidence. Flores argues that the district court erred when it excluded extrinsic evidence showing that Ortiz made a prior inconsistent statement. Federal Rule of Evidence 613(b) sets conditions for when such evidence may be admitted—only when there is a chance for the witness to "explain or deny the statement" and the adverse party to cross-examine, "or if justice so requires." But the rule says nothing about whether extrinsic evidence should be admitted once those conditions are met. For that, we again look to Rule 403.

We faced this issue in *Rush v. Illinois Central Railroad Company*, 399 F.3d 705 (6th Cir. 2005). There, a child suffered an injury from a train that required partial amputation of his leg. *Id.* at 710. A witness to the accident told railroad police at the scene that the child had fallen while attempting to jump onto the moving train. *Id.* Later at trial, the witness testified that the train was stopped when the child began playing on it. *Id.* at 711–12. On cross-examination, the witness admitted to making the prior inconsistent statement. *Id.* Yet, the district court still admitted an audio recording of the prior interview with the railroad police. *Id.* at 713. On appeal, we held that admitting extrinsic evidence of the prior inconsistent statement was erroneous because "when a witness admits to making a prior inconsistent statement, extrinsic proof of the statement is inadmissible" under Rule 403 as needlessly cumulative. *Id.* at 723 (citing *Dilley v. Chesapeake & Ohio Ry. Co.*, 327 F.2d 249, 251 (6th Cir. 1964)).

The same thing happened here. Although Ortiz made an inconsistent statement while testifying about her knowledge of the firearm, she admitted on cross examination to making the prior inconsistent statement. Therefore, the district court did not abuse its discretion when it refused to allow the defense to present cumulative, extrinsic evidence to impeach Ortiz.

Flores attempts to distinguish *Rush* by claiming that the district court's decision in *Rush* was erroneous because the extrinsic evidence there was "cumulative." *Id.* at 723. But the evidence was cumulative in *Rush* precisely for the reason it is cumulative here: The witness admitted on the stand to making the prior inconsistent statement. No further evidence is necessary to impeach the witness's credibility on this point.

Since our decision in *Rush*, we have at least twice posited that this court has not taken a definitive position on this issue. *See United States v. Whalen*, 578 F. App'x 533, 541 (6th Cir.

2014) ("This court has never taken sides in that debate."); *United States v. Richardson*, 793 F.3d 612, 627 (6th Cir. 2015), *cert. granted, judgment vacated*, 577 U.S. 1129 (2016) ("This Circuit has yet to decide this issue."). Those cases do not acknowledge *Rush* and are not binding, as one is unpublished and the other vacated. Anyway, both decided that any potential error in precluding the extrinsic evidence was harmless. So too here. Even if precluding the extrinsic impeachment evidence was an error, it was harmless, "as the substance of the inconsistent statement was before the jury and admission of the [testimony] itself would have been cumulative." *United States v. Davis*, No. 93-5984, 1994 WL 362061 (6th Cir. 1994) (per curium). Thus, the court's decision to preclude the extrinsic evidence was not an abuse of discretion.

**III.**

Finally, we turn to Flores's sufficiency-of-the-evidence claim. When reviewing these claims, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime." *United States v. Damra*, 621 F.3d 474, 494 (6th Cir. 2010) (citation omitted). To sustain a felon-in-possession conviction, the government must prove "(1) that the defendant has a prior conviction for a crime punishable by imprisonment for a term exceeding one year; (2) that the defendant thereafter knowingly possessed the firearm and ammunition specified in the indictment; and (3) that the possession was in or affecting interstate commerce." *United States v. Hall*, 20 F.4th 1085, 1107 (6th Cir. 2022) (quoting *United States v. Schreane*, 331 F.3d 548, 560 (6th Cir. 2003)). Flores challenges only the second element, maintaining that he did not possess the firearm and that the evidence proffered by the government on that point does not support his conviction. We disagree.

Possession of a firearm may be actual or constructive and may be proven by direct or circumstantial evidence. *United States v. Campbell*, 549 F.3d 364, 374 (6th Cir. 2008); *see also United States v. Horton*, 742 F. App'x 973, 976 (6th Cir. 2018).

The government offered significant evidence that Flores possessed the firearm. Ortiz testified that she saw Flores handling the gun with a black glove just hours before he was arrested. Officer Schoen testified that when he approached the rear of the car where Flores was sitting, Flores made furtive movements near his feet. Officers then found a black glove and the firearm in question just inches from his feet, as well as ammunition in the map pocket by his knee. Officers discovered text messages on Flores's cell phone, the most recent from nine days prior to his arrest, indicating that he had a gun. On top of all that evidence was the expert's testimony that it was 1.2 octillion times more likely than not that Flores's DNA was on the gun. Thus, the government offered sufficient evidence from which a reasonable jury could find that Flores possessed a firearm. *See Horton*, 742 F. App'x at 977 ("A defendant's proximity to a weapon combined with other incriminating evidence—including an attempt to conceal the weapon or forensic evidence—may support a finding of possession.") (citation omitted); *United States v. Arnold*, 486 F.3d 177, 180–83 (6th Cir. 2007) (upholding firearm conviction where a witness testified that the defendant threatened her with a gun shortly before officers found a gun under the defendant's car seat); *United States v. Montague*, 438 F. App'x 478, 481 (6th Cir. 2011) (upholding firearm conviction due to proximity of gun to defendant and officers' testimony that defendant made furtive movements); *United States v. Holycross*, 333 F. App'x 81, 83–84 (6th Cir. 2009) (upholding firearm conviction where gun was under the passenger seat, defendant's DNA evidence was on it, and defendant had made furtive movements).

Flores counters that the text messages are ambiguous, the DNA evidence is equivocal, and the witness testimony is not credible. But what weight to give each of those pieces of evidence is for the jury decide. We cannot "weigh the evidence, assess the credibility of the witnesses, or substitute our judgment for that of the [trier of fact]." *United States v. Alebbini*, 979 F.3d 537, 543 (6th Cir. 2020) (alterations in original). All we are asked to decide is whether *any* reasonable jury could have found beyond a reasonable doubt that Flores possessed the firearm. Given the evidence stated above, that standard is met.

## IV.

For these reasons, we AFFIRM the judgment of the district court.